93 F.3d 1327
 71 Fair Empl.Prac.Cas. (BNA) 1519,
68 Empl. Prac. Dec. P 44,268
Kristi Blackburn KNOX, Plaintiff-Appellee/Cross-Appellant,
v.
STATE OF INDIANA, Defendant-Appellant/Cross-Appellee.
 Nos. 95-1858, 95-1902.
 United States Court of Appeals,
Seventh Circuit.
 Argued January 4, 1996.
Decided August 26, 1996.
 
 Richard L. Darst (argued), Mantel, Cohen, Garelick, Reiswerg & Fishman, Indianapolis, IN, for Kristi Blackburn Knox.
 Sabra A. Weliever (argued), Civ. Rights Section, Seth M. Lahn, Office of Atty. Gen., Indianapolis, IN, for State of Ind., in No. 95-1902.
 Sabra A. Weliever (argued), Civ. Rights Section, Pamela Carter, Office of Atty. Gen., Indianapolis, IN, for State of Ind., in No. 95-1858.
 Before ROVNER, DIANE P. WOOD, and EVANS, Circuit Judges.
 DIANE P. WOOD, Circuit Judge.
 
 
 1
 Kristi Knox is employed as a correctional officer at the Correctional Industrial Complex (CIC) in Pendleton, Indiana. Subjected to blatant sexual harassment on the job, she brought this case under Title VII, 42 U.S.C. § 2000e-5, against the State. After a jury trial, the jury returned a split verdict, ruling for Knox on one claim and the State on two others. The State appealed and Knox cross-appealed, both claiming that the jury instructions on the claims they lost were flawed, and both claiming that the evidence did not support the jury verdicts adverse to them. Bearing in mind the deference we owe to a jury verdict, we conclude that all three verdicts were sufficiently supported by the evidence, and that the instructions adequately stated the governing law. We therefore affirm the district court on all counts.
 
 
 2
 * At the CIC, Knox first worked on "the line" of correctional officers on the second shift (3:15 p.m. to 11:30 p.m.). (At the times relevant to this case, she had not yet married, and thus her name appears as Kristi Blackburn in many parts of the record. We refer to her here as Knox, in keeping with the name she has used in this court.) Some time around October of 1990, she changed to the first shift because of the more reasonable hours. It was then that she first encountered Captain Robert Stewart. Stewart was the Lead Captain, who supervised all other captains, lieutenants, sergeants, and other correctional officers at CIC. He was, therefore, Knox's supervisor.
 
 
 3
 Starting in December 1991, Stewart began sending Knox electronic mail messages asking her for sex. He often propositioned Knox using acronyms; for example, he frequently asked her whether she wanted to have a HGTWM, which was later translated as a "horizontal good time with me." Stewart also repeatedly asked Knox out on dates, calling her on the telephone and leaving messages reminding her to check her e-mail. Whenever Knox would tell Stewart that she was not interested in dating him, or in having sex with him, he would ask her why not and pursue her further. On one occasion, when Knox turned him down (because she was involved with another man who she eventually married), Stewart responded, "Well, then, we can just maybe have sex." After Knox again rejected him, Stewart replied that he "definitely saw a shift change in [her] future." Knox was frightened, because she needed her job and Stewart was in a position to recommend, and perhaps effect, such a change.
 
 
 4
 After Stewart learned that Knox might have broken up with her boyfriend, his overtures (which had never stopped) increased. Knox responded to some of them equivocally, promising to write back later via e-mail, but always turning down Stewart's immediate proposals for sex, or (on one occasion) to "makeout." Stewart's friends at the CIC were also pressuring her to respond to him, frequently telling her that Stewart was "hot for her," and that he "wants her really bad." The language was often graphic, and the record leaves no doubt that Stewart was trying to set up a sexual encounter.
 
 
 5
 In February 1992, the day after Stewart called Knox at home asking for a date, Knox talked to Lisa Watson, another correctional officer, and told her the whole story. Watson told Knox that she had to report Stewart's actions. Watson then talked to Sergeant Vittatoe, who was Watson's immediate supervisor, who in turn spoke with Knox. Knox told Vittatoe the whole story, too, including Stewart's threat to change her shift. Vittatoe responded that this was sexual harassment and that it was his duty as a supervisor to report it. He did so, recounting the entire situation to Jayne Brown, the CIC affirmative action officer, on February 7, 1992.
 
 
 6
 That evening, Brown met with Knox, Vittatoe, and Watson to discuss Knox's statements about Stewart. According to Brown's notes, she was convinced that "Stewart previously, then recently, has created a very uncomfortable working condition for [Knox]. He made it known from the start that his intentions were purely sexual. [Knox] is in fear of retaliation, gossip, losing her job, etc." Brown asked Knox, Watson, and Vittatoe to make written statements, which they did, on that same day. On February 11, 1992, Willard Plank, Investigator for the Internal Affairs Division of the Department of Corrections (DOC), interviewed Knox, while the DOC had Lonnise Robinson interview Stewart. The report Knox filed with Brown, and her subsequent discussion with Plank, constituted her formal complaint to the DOC.
 
 
 7
 Stewart initially denied any knowledge of why Knox would have filed a complaint against him, but his tune changed when he found out that the investigator had copies of the e-mails he had sent to Knox. He then admitted that he understood how his behavior could be interpreted as sexual harassment. Indeed, this was not the first time Stewart had found himself in this kind of situation. At the disciplinary hearing that took place on February 27, 1992, approximately two weeks after his interview with Robinson, Stewart acknowledged that he had had a sexual relationship with another subordinate, Laura Callahan (a correctional officer at the Indiana Reformatory), about which the same superintendent had spoken to him within the past six months. Stewart admitted that while he was engaged in the sexual relationship with Callahan, he had given her an inappropriately favorable evaluation. And Callahan was not the only other one. Michelle Rowland, another female officer at the CIC, testified that Stewart had made graphic sexual proposals to her as well (for example, asking whether she was "ready to be the buffet for the day."). Stewart also had a relationship with Officer Beth Wadsworth, also from the CIC, who later left the institution.
 
 
 8
 On March 4, 1992, the superintendent issued his report and recommendation regarding the harassment allegations filed by Knox. In his Pre-Deprivation Meeting Minutes (his written record of findings), the superintendent found that Stewart had engaged in sexual discrimination. The minutes recounted Stewart's past problems with workplace sexual liaisons and noted that he had been "individually ... talked to on several occasions" about "social/sexual overtures to subordinates." After review of the report submitted by the Internal Affairs Division of DOC, Stewart was found guilty of engaging in sex discrimination and in conduct unbecoming staff. The report referred to the "constant and repeated warnings which have been provided to you, along with the material that you had an opportunity to read and sign indicating that you understand what sexual harassment is." The superintendent ordered that Stewart be reduced in rank from Lead Captain to Correctional Officer immediately and that he be given a written reprimand in lieu of being suspended from duty without pay for ten days. The minutes concluded by stating as follows:
 
 
 9
 Your continued conduct of social and sexual proposals to female staff impose a substantial civil liability not only to yourself, as an individual, but to the Major, to Mr. Dueth, and myself and upon the Department of Corrections.
 
 
 10
 When Stewart was first interviewed by the DOC regarding the sex harassment charge, the investigator, Robinson, told Stewart that the harassment charges had been filed by Knox. Angry, he told his friends at the CIC, who in turn began to make insulting and demeaning statements about Knox around the institution, both to staff and in front of inmates. Stewart's friends made it known that they intended to make Knox's life "hell," and that they were going to "get her." On May 7, 1992, Knox spoke to Brown about the relentless campaign of fellow employee harassment she was enduring as a result of the sexual harassment complaint she had filed against Stewart. In spite of her knowledge of the severity of the underlying situation and the notoriety of the offender, Brown did nothing at the time, telling Knox that she could not investigate unless Knox gave her the names of the people who were allegedly speaking negatively about her. Shortly after this meeting, troubles broke out at the CIC. There was a hostage incident on May 11, 1992, for which Brown was a member of the Situation Control Team in charge of negotiations. Brown was also busy interviewing and providing support counseling to staff, which took most of her time for the next few weeks.
 
 
 11
 In the meantime, however, Knox was able to find out the names of some of the people who were making her life miserable. She gave Brown four names on June 7, 1992. Brown followed up, requesting statements from the four witnesses on June 8 and 9. On June 9, the Superintendent issued a memorandum that was intended to inform CIC employees that negative gossip about fellow employees would not be tolerated. The memorandum stated, in part, that this gossip "constitutes a form of retaliation against staff who have followed policy and procedure and then have been verbally attacked by some employees for doing so." In addition, Brown verbally counseled all four officers identified as gossipers and recommended disciplinary action against one of them.
 
 II
 
 12
 Knox filed this case under Title VII against the State on July 13, 1993. Her complaint contained three counts: (I) quid pro quo sexual harassment, (II) hostile work environment harassment, and (III) retaliation. As noted above, the case went to trial before a jury, with the magistrate judge presiding by consent of the parties. The jury returned a verdict for the State on counts I and II and a verdict for Knox on count III. On August 30, 1994, the court entered judgment of $40,000 in compensatory damages for Knox and a permanent injunction requiring the State to refrain "from engaging in retaliatory conduct toward [Knox] and/or permitting its employees to continue to engage in retaliatory conduct toward [Knox] after becoming aware that retaliation is occurring." The court also required the DOC to communicate its policy against retaliation to its employees. The State filed a renewed motion for judgment as a matter of law or for a new trial on September 14, 1994, which the court denied on February 21, 1995.
 
 III
 A. The State's Appeal: Count III
 
 13
 The State raises two basic points in its appeal, both of which we review giving great deference to the district court. First, it argues that the instructions to the jury on the retaliation claim misstated the law. This court's review of jury instructions is limited. We construe the instructions in their entirety, seeking to determine if, as a whole, they were sufficient to inform the jury correctly of the applicable law. Wilson v. Williams, 83 F.3d 870, 874 (7th Cir.1996). Second, it argues that the district court should have granted its motion for new trial because the verdict was against the great weight of the evidence. Given the respect that the Seventh Amendment to the Constitution commands us to give to the findings of fact by a civil jury, as well as the far better position a district court judge is in to consider whether a jury's verdict went against the weight of the evidence, our review here is only to determine whether the court abused its discretion in denying the motion. Harrison v. Dean Witter Reynolds, Inc., 79 F.3d 609, 614 (7th Cir.1996); Gorlikowski v. Tolbert, 52 F.3d 1439, 1446 (7th Cir.1995). As this court explained in Gorlikowski, the test in this circuit for reviewing a jury verdict on appeal is "whether there is a reasonable basis in the record for the verdict.... If this test is met, we will not reweigh the evidence but will let the verdict stand." Id. at 1446 (internal quotation omitted). See also Dallis v. Don Cunningham & Associates, 11 F.3d 713, 715 (7th Cir.1993).
 
 
 14
 Instruction No. 9 to the jury described what the statute prohibits for each of the claims Knox was presenting. Part 3 of that instruction dealt with "retaliation for complaints of sexual harassment," and defined retaliation generally as:
 
 
 15
 ... imposition of a job related detriment or withholding of a job related benefit by the employer, or by co-workers with the acquiescence of the employer, as a result of the employee's protest about sexual harassment or the employee's resort to corrective mechanisms provided by the employer or governmental agencies.
 
 
 16
 Instruction 15 then told the jury what the "essential elements" of Knox's retaliation claim were:
 
 
 17
 1. That the plaintiff protested the existence of sexual harassment to the employer or to a government agency charged with enforcement of employment discrimination laws;
 
 
 18
 2. That an adverse action affecting the terms of her employment was taken by her employer or by coworkers with the knowledge and acquiescence of her employer;
 
 
 19
 3. The adverse action was related in terms of cause and effect to the protest of sexual harassment.
 
 
 20
 Plaintiff must prove all of these essential elements (1, 2, and 3) by a preponderance of the evidence to obtain a verdict in her favor on Count III.
 
 
 21
 Defendant has denied each of these elements.
 
 
 22
 Finally, in Instruction No. 16 the court explained elements 2 and 3 of the retaliation claim further:
 
 
 23
 An employer acquiesces in retaliatory harassment by co-workers when the employer knows of the harassment and fails to act promptly to take actions reasonably likely to remedy the harassment and prevent future episodes.
 
 
 24
 An adverse action is related in terms of cause and effect to a protest when, despite the existence of other reasons for the adverse action, were it not for plaintiff's protest the adverse action would not have occurred or been substantially less adverse.
 
 
 25
 In reviewing these instructions, we are not looking for an idealized set of perfect jury instructions. Instead, as noted earlier, we construe them in their entirety to determine if the instructions as a whole are sufficient to inform the jury correctly of the applicable law. Wilson v. Williams, 83 F.3d at 874; United States v. Villarreal, 977 F.2d 1077, 1079 (7th Cir.1992). The submission of inadequate jury instructions requires reversal only if it appears that the jury's comprehension of the issues was so misguided that one of the parties was prejudiced. Soller v. Moore, 84 F.3d 964, 969 (7th Cir.1996); In re CLDC Management Corp., 72 F.3d 1347, 1353 (7th Cir.1996). See also Stuart Park Associates Limited Partnership v. Ameritech Pension Trust, 51 F.3d 1319, 1323 (7th Cir.1995).
 
 
 26
 Before the district court, the State raised only a general objection to the inclusion of the phrase "retaliation can be committed by co-workers with the knowledge and acquiescence of the employer," without specifying exactly what was wrong with it. In its renewed motion for judgment as a matter of law, and before this court, the State made the more specific argument that retaliation could only occur within the context of an "employment action," and that as a matter of law an employee cannot take an "employment action" against a co-equal fellow employee. The magistrate judge was of the view that the State had failed to object to the instructions at the trial on this basis and consequently that the new argument was waived.
 
 
 27
 We agree with the district court that the State's trial objection was not specific enough to alert the district court to the more refined argument it is now making, and thus that the objection did not meet the requirements of Fed.R.Civ. P. 51. Maltby v. Winston, 36 F.3d 548, 560-61 (7th Cir.1994) (Rule 51 requires a specific objection on the record); Mankey v. Bennett, 38 F.3d 353, 361-62 (7th Cir.1994); Littlefield v. McGuffey, 954 F.2d 1337, 1344-45 (7th Cir.1992); Sims v. Mulcahy, 902 F.2d 524, 535 (7th Cir.), cert. denied, 498 U.S. 897, 111 S.Ct. 249, 112 L.Ed.2d 207 (1990); Guerts v. Barth, 892 F.2d 622, 624 (7th Cir.1989) (specificity in objections is necessary in order to apprise the district court of the legal and factual basis for the objection); Williamson v. Handy Button Machine Co., 817 F.2d 1290, 1295 (7th Cir.1987) ("objection must be sufficiently detailed to draw the court's attention to the defect [in the jury instruction]"). Because the State failed to make its objection with the requisite specificity before the jury retired, the objection is waived. See Haley v. Gross, 86 F.3d 630, 644 (7th Cir.1996); Doe v. Johnson, 52 F.3d 1448, 1458-59 (7th Cir.1995); Littlefield, 954 F.2d at 1344; Olson v. Tyler, 825 F.2d 1116, 1118 (7th Cir.1987). Moreover, the State cannot appeal to a plain error doctrine, since it does not apply to civil cases except with respect to subject matter jurisdiction and a very limited category of evidentiary rulings. Haley, 86 F.3d at 644; Prymer v. Ogden, 29 F.3d 1208, 1214 (7th Cir.1994); Maul v. Constan, 928 F.2d 784, 787 (7th Cir.1991).
 
 
 28
 Even on the assumption that the State's objection was adequate, the instructions actually given accurately indicated that fellow employee action can sometimes form the basis of Title VII liability. The part of Title VII involved in Count III was the rule prohibiting an employer from retaliating against an employee because she has opposed any practice unlawful under Title VII. See 42 U.S.C. § 2000e-3(a). As we recently reiterated in McKenzie v. Illinois Department of Transportation, 92 F.3d 473, 482-83 (7th Cir.1996), the familiar framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), governs retaliation cases. The plaintiff must prove that (1) she engaged in statutorily protected expression or activity, (2) she suffered an adverse action by her employer, and (3) there is a causal link between the protected expression and the adverse action. McKenzie, 92 F.3d at 482-83; Brenner v. Brown, 36 F.3d 18 (7th Cir.1994); Reed v. Shepard, 939 F.2d 484, 492 (7th Cir.1991). Once she has done so, the employer must articulate a legitimate, non-retaliatory reason for its actions, and if it does, then the burden shifts back to the plaintiff to show that the proffered reasons are pretextual. None of this matters, however, once the case has been properly submitted to the jury and the jury has ruled for the plaintiff; at that point, the only issue is whether the jury's verdict is against the weight of the evidence.
 
 
 29
 The issue on which the State focuses to support its claim that the jury should not have been given this case is the necessary link to the employer's action. Its objection appears to have been based on the theory that fellow employee action can never be enough to hold an employer liable under Title VII, no matter what the surrounding circumstances. If this is what the State was saying, then it is wrong. It is well established that an employer can be held liable under Title VII for sexual harassment by an employee's co-workers if the employer had actual or constructive knowledge of the harassment and failed to address the problem adequately. See Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 446 (7th Cir.1994) (no evidence that employer had either actual or constructive notice of harassment by co-workers); Carr v. Allison Gas Turbine Division, GMC, 32 F.3d 1007, 1012 (7th Cir.1994); Guess v. Bethlehem Steel Corporation, 913 F.2d 463, 465 (7th Cir.1990). In Hunter v. Allis-Chalmers Corp., 797 F.2d 1417 (7th Cir.1986), this court held an employer liable under Title VII for failing to deal effectively with what it knew to be a vicious campaign of racial harassment by co-workers against Hunter and other Black workers. These cases show that in general, an employer may be responsible for co-worker actions if it has the proper notice or knowledge of the problem. Although each one of them deals with a direct claim of harassment by coworkers, there is nothing to indicate that the principle of employer responsibility does not extend equally to other Title VII claims, such as a claim of unlawful retaliation. In brief, there are two questions: (1) is the right link established between the employer and the co-workers, so that the employer can be held responsible for their actions, and (2) does the conduct complained of constitute something actionable under the statute, such as discrimination, harassment, or retaliation. The district court correctly instructed the jury that employers can be liable for co-worker actions when they know about and fail to correct the offensive conduct.
 
 
 30
 There is nothing in the law of retaliation that restricts the type of retaliatory act that might be visited upon an employee who seeks to invoke her rights by filing a complaint. It need only be an adverse employment action, as we have often held. See, e.g., McKenzie, 92 F.3d at 485-86 (questioning whether the law still requires the retaliatory action to be job-related); Smart v. Ball State University, 89 F.3d 437, 440-41 (7th Cir.1996) (emphasizing breadth of definition of adverse employment action); Veprinsky v. Fluor Daniel Inc., 87 F.3d 881, 892 (7th Cir.1996); McDonnell v. Cisneros, 84 F.3d 256, 258-59 (7th Cir.1996); Brenner, 36 F.3d at 19; Reed, 939 F.2d at 492-93. As the discussion in Smart reminded us, adverse actions can come in many shapes and sizes. See Smart, 89 F.3d at 442 & n. 1; Collins v. State of Illinois, 830 F.2d 692, 703 (7th Cir.1987). No one would question the retaliatory effect of many actions that put the complainant in a more unfriendly working environment: actions like moving the person from a spacious, brightly lit office to a dingy closet, depriving the person of previously available support services (like secretarial help or a desktop computer), or cutting off challenging assignments. Nothing indicates why a different form of retaliation--namely, retaliating against a complainant by permitting her fellow employees to punish her for invoking her rights under Title VII--does not fall within the statute. The law deliberately does not take a "laundry list" approach to retaliation, because unfortunately its forms are as varied as the human imagination will permit. The instructions here correctly left the jury free to evaluate the record as a whole and to decide whether the State (in the person of the prison officials) retaliated against Knox for causing (by her invocation of Title VII rights) the demotion of the Lead Captain in the prison, by sitting on its hands in the face of the campaign of co-worker harassment about which it knew no later than May 7, 1992.
 
 
 31
 This takes us to the particular evidence in the case, which the State challenges as insufficient to support the verdict. Its argument here faces an uphill battle, in light of the fact that it is the jury's job, not ours, to weigh the competing stories and to decide which one to accept. In addition, we review the district court's decision to deny the State's motion for new trial only for abuse of discretion. It makes no difference whether we would independently have reached the same result as the trial court, and it is clear that we are not entitled to re-examine the factual findings of the jury as long as there is a reasonable basis in the record for the verdict. See Gorlikowski, 52 F.3d at 1446; Dallis, 11 F.3d at 715.
 
 
 32
 After carefully reviewing the record, we are satisfied that the evidence was sufficient to support the verdict and that the district court did not abuse its discretion in denying the new trial motion. First, it is clear that Knox made an appropriate complaint to her employer, the CIC, about Stewart's persistent obnoxious, sexually harassing behavior, in early February 1992. Second, adverse workplace actions followed her complaint, in the form of fellow worker harassment and vicious gossip. It is undisputed that Knox informed the employer, in the person of Brown, no later than May 7, 1992, about the retaliation she was facing for her filing of the complaint against Stewart, by then the former Lead Captain, and according to the record someone with many allies in the institution. It is also clear that there was a cause and effect relationship between the complaint she filed and the retaliation inflicted by her co-workers.
 
 
 33
 The most difficult point for Knox, and the one the State argues most strongly before us, is whether the State acquiesced in the co-worker action. It points out that the prison was in a state of confusion during most of the month of May, due to the hostage incident of May 11, 1992. It argues that Brown was too busy to respond to Knox until things settled down in early June, and that Brown may have had no duty to respond in any event until Knox gave her the names of the offending employees. When Knox furnished those names, it asserts that the State acted promptly to discipline them and to inform the staff as a whole that negative gossip would not be tolerated. Interestingly, the memorandum even stated that negative gossip "constitutes a form of retaliation."
 
 
 34
 We have no doubt that the State was entitled to put its version of these events before the jury, and that a reasonable jury might have agreed with it. Nevertheless, Knox was equally entitled to put her own spin on the same events. The jury knew that Brown was well aware of the seriousness of the harassment Knox had faced from Captain Stewart, because Brown had been involved in the case from the outset. Brown's reaction when Knox approached her on May 7th might have been a brush-off, motivated by the trouble Knox's complaints had caused for the institution (such as the loss of the Lead Captain, the need to find a replacement, and disruption in the workforce). Brown's assertion that it was Knox's burden to furnish the names of the gossiping employees might have been a pretext, particularly given how difficult it is to find out exactly who has been talking behind one's back. The people who were calling her a "fucking bitch" and saying that they would "get her" and make her life hell were unlikely to volunteer their names either to her, or to anyone else who they thought would be likely to reveal their identities. The jury might also have regarded the month's delay as unwarranted, for several reasons. First, the asserted reason for the delay--the need for names--played no role in the remedial action the prison took, in the form of the June 9 memorandum to all employees. Second, in response to the State's argument that Brown was otherwise occupied during May and early June, the jury might have found implausible the notion that Brown was the only person at the prison who could do anything about the problem. It was entitled, although not required, to conclude that the delay in responding to Knox's problem was a sign of the State's desire to punish Knox for being a troublemaker. Third, Brown was not busy with the hostage crisis until May 11, four days after Knox complained to her. The jury may have thought that it does not take four days to issue a cautionary memorandum about fellow employee harassment (especially since it took only two days in June, from the 7th to the 9th, to take this action). We stress that this is not the only way to view the evidence, and that it is entirely possible that we might have seen things differently if we had been charged with making this decision. Nevertheless, we are not some kind of superjury, from whom losing parties can get a second bite at the apple. While we agree with the State that it was a close call, we conclude that the jury was entitled to find that the CIC officials retaliated against Knox through their acquiescence in the co-worker campaign of retaliatory harassment against Knox, which they knew about no later than May 7. The jury thought this was worth $40,000 in damages, an amount which the State has not challenged separately.
 
 B. Knox's Cross-Appeal: Counts I and II
 
 35
 Knox's cross-appeal is based entirely on her claim that the district court erroneously instructed the jury during the course of the trial that consensual sexual relations are not sexual harassment. This, she asserts, fatally tainted the jury's consideration of both Counts I and II. Unfortunately for Knox, although we entirely agree with her that the instruction was wrong, we find that it was harmless error when taken together with the final instructions to the jury on these two counts and the trial record as a whole.
 
 
 36
 Prior to Knox's rebuttal testimony, the magistrate judge gave the following instruction to the jury:
 
 
 37
 There has been evidence offered from time to time ... concerning Stewart's prior involvement with other correctional officers, or other women at the--at either the CIC or the reformatory. The jury is instructed that consensual sexual relationships are not sexual harassment and that, therefore, any evidence or testimony concerning prior sexual or other activity between Captain Stewart and other women, either at the CIC or the reformatory, any evidence or testimony about that is not to be considered by you for any purpose in this case. It is just not relevant.
 
 
 38
 Knox argues that this instruction tainted both Counts I and II, because it might have led the jury to believe that the mere fact that Stewart never actually forced Knox to do anything meant that he had not harassed her. Furthermore, she argues that Stewart's former acts were highly relevant to the issue of the employer's knowledge.
 
 
 39
 Before addressing Knox's specific claims, we reiterate that the instruction did not correctly state the law. In Meritor Savings Bank v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court unequivocally stated that "[t]he fact that sex-related conduct was 'voluntary,' in the sense that the complainant was not forced to participate against her will, is not a defense to a sexual harassment suit under Title VII. The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.' " Id. at 68, 106 S.Ct. at 2406. See also Reed v. Shepard, 939 F.2d 484 (7th Cir.1991). The CIC obviously understood this distinction, because the minutes of the superintendent's hearing with Stewart expressly warned him to observe the rules about sexual harassment and stated that his conduct had been inappropriate in the past. The question for us on this appeal is not whether Stewart had sexually harassed other individuals, but rather whether this comment tainted the jury's consideration of Knox's case seriously enough that a new trial is required.
 
 
 40
 Our review of the instructions given on both the quid pro quo theory of sexual harassment (Count I) and the hostile environment claim (Count II) convinces us that the jury was properly instructed on both counts. On the quid pro quo claim, the court told the jury that the requests or advances had to be "unwelcome," and it used the same term for the hostile environment claim. Furthermore, it is unlikely that the mid-trial instruction caused the jury to think that the CIC was unaware of Stewart's inappropriate actions. The instructions for Counts I and II made it clear that the requests or advances had to be made by one in the position of an employer, and the jury was instructed that a supervisory employee could be an "employer" if that supervisor had even the appearance of power to hire, fire, demote, or confer a promised benefit or detriment on the employee. Stewart, of course, was the Lead Captain, and the jury was entitled to consider whether he had that kind of influence over Knox. Furthermore, the jury had before it the CIC's own evaluation of Stewart's conduct, which suggests that it was in little doubt about the CIC's knowledge of his prior behavior. We therefore see no prejudice from the erroneous instruction stemming from its potential to indicate that the CIC had no prior knowledge about Stewart's misbehavior.
 
 
 41
 Reversal on the basis of an isolated comment in the middle of the trial would be required only if we believed that the jury's comprehension of the case was influenced so heavily by that comment that the litigant is prejudiced. Soller, 84 F.3d at 969; Wilson, 83 F.3d at 874; In re CLDC Management Corp., 72 F.3d at 1353; Villarreal, 977 F.2d at 1079. In our view, the court cured whatever prejudice might have occurred from its erroneous comment when it correctly instructed the jury on the whole case before it retired. Again, bearing in mind that it is the jury's job to weigh the evidence, not ours, we see no reason to disturb the verdicts of this jury on Counts I and II.
 
 C. The Injunction
 
 42
 Finally, we address the State's claim that the district court should not have entered the injunction against it requiring it to post a notice communicating its policy against retaliation to its employees. This claim is entirely based on the State's position that the jury's verdict on Count III cannot stand. Because we have rejected that argument, we also find no merit in its attack on the injunction.
 
 
 43
 The judgment of the district court is AFFIRMED.