Kelly K. DAVIS and Ronald
E. Davis, Plaintiffs,

v.

PALMER DODGE WEST, INC., and
George Smith, Defendants.

No. IP 96–0124–C M/S.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Sept. 2, 1997.

Mary Jane LaPointe, Lowe, Gray, Steele & Darko, Indianapolis, IN, for Plaintiffs.

Stephen J. Peters, Stewart & Irwin, Indianapolis, IN, for Defendants.

## ORDER

McKINNEY, District Judge.

This matter is before the Court on the motion filed December 16, 1996, by defendants, Palmer Dodge West, Inc. and George Smith, against plaintiffs, Kelly K. Davis ("Davis") and her husband Ronald E. Davis, seeking judgment as a matter of law on all counts of the complaint. According to the amended complaint, Davis's former employer, Palmer Dodge West, Inc. ("Palmer Dodge"), intentionally discriminated against her in the terms and conditions of her employment because of her sex. Specifically, Davis alleges that she was the victim of sexual harassment by her former supervisor, George Smith ("Smith"), that Palmer Dodge's response to her complaint was inadequate, and that she suffered a form of retaliation for having complained. In Davis's view, Palmer Dodge's handling of the situation between her and Smith violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5.

Smith and Palmer Dodge argue that once Davis complained, the sexual harassment stopped and she did not suffer any adverse employment action as a result of the complaint. Moreover, to the extent that any of Smith's conduct following her complaint could be deemed retaliatory, Palmer Dodge cannot be held liable for it because Davis did not report any retaliation to management. Consequently, Palmer Dodge claims that it is entitled to judgment as a matter of law on all of the Title VII claims, and Smith claims he is entitled to summary judgment on the corresponding state law claims of battery, intentional infliction of emotional distress, and loss of consortium by Davis's spouse.

Having been fully briefed on the relevant issues, and having reviewed the designated evidentiary materials, the Court finds that the defendants' summary judgment motion on the Tide VII claims should be **DENIED,** as further explained below. The motion as it relates to the state law claims is **GRANTED.**

## I. FACTUAL & PROCEDURAL BACKGROUND

Davis accuses Smith of sexually harassing her beginning in late 1994 and continuing through March of 1995, at which time she complained to certain management personnel about his conduct. Davis's work performance did not change from before the complaint. Davis Aff. ¶ 13. However, after her complaint about Smith, he allegedly continued to harass Davis by criticizing her job performance, her work habits, and subjecting her to unprecedented verbal abuse. She complained again to McCune about Smith's treatment of her, but was told not to worry about it. Plf's Exh. H, Davis Dep. Exh. 23, Calendar; Davis Dep. at 172–74, 346–47. In June of 1995, Davis was overlooked for a promotion she had wanted and felt qualified for, and her vacation request was denied by Smith. Davis Dep. at 154–55, 348. She ultimately took her vacation, but Smith rebuked her for going over his head on the issue. Davis, Dep. at 348.

Also in June, Davis noticed that Smith had left a notebook on his desk that she had observed him using on several occasions. She opened the notebook and found that it contained notes about what she wore to the office, who she talked with, how she acted, and things that she had said. The entries on her conduct were dated after the date on which she had complained to McCune about Smith. Davis Dep. at 145–47; Smith Dep. at 86–93. According to Smith, he began taking notes on Davis's conduct at the suggestion of Curry. Smith Dep. at 103–04. When Davis found the notes Smith had been keeping she called McCune and complained to him about it, and he told her not to worry about it, and to go back to work. Davis Dep. at 148–49. Finally, Davis complained to Don Palmer about Smith's pre- and post-March 1995 conduct, and Palmer's response was to offer to find a position for her in one of the other Palmer Dodge locations. Davis Dep. 313–17.

Finding this an inadequate response because of the additional time she would have to spend traveling to work, Davis resigned from her employment on or about August 1, 1995.

She timely filed a charge with the Equal Employment Opportunity Commission ("EEOC") on August 1, 1995, and received a right to sue letter on January 12, 1996. This action commenced on January 29, 1996, and an amended complaint was filed on April 1, 1996. That complaint states, in two counts, that Palmer Dodge discriminated against Davis through the actions of Smith, its agent and her only supervisor, whose conduct made submission to his sexual advances a term and condition of her employment. This type of harassment is called *quid pro quo*. Smith is also accused of subjecting her to a continuing, unwelcome, and pervasive hostile environment through conduct such as touching her on the buttocks and the breast, bringing in and showing her lingerie and sexually-oriented catalogs and magazines, staring at her, calling her at home, massaging her back and neck, buying her jewelry, and objecting when she spoke to other men. When Davis reported Smith's conduct to certain management personnel, they responded on behalf of Palmer Dodge by counseling Smith and warning him of the possibility of termination if his conduct continued. Curry Aff. ¶ 11. In response to the question of whether the "sexual harassment, as [she] perceived it, had stopped" after the counseling, Davis said it had. Davis Dep. at 145.

It is undisputed that Smith's treatment of Davis changed after her complaint and his subsequent counseling. Instead of touching her, making suggestive statements, staring at her, or giving her jewelry, Smith began criticizing her for not following the rules, complaining about her on a regular basis, and requiring her to comply with employment procedures that other employees did not have to follow. Nance Aff. ¶¶ 20–24. Although Smith had been told during his counseling that he would no longer be allowed to "discipline" Davis, he nevertheless remained in his position as Office Manager of the Palmer Dodge office in which both he and Davis worked. He had held that position for fifteen years, and as such he was responsible for direct supervision of all the employees in the office, and had been responsible for hiring Davis. Davis Dep. at 11, 21–22, 26. Smith was also responsible for overseeing the timely performance of his employees' duties, promoting them, conducting their pay reviews, disciplining them, enforcing the work rules, and even firing employees, if necessary. *Id.* 24–27, 79.

The office in which they worked was small, approximately twenty by twenty feet, and was shared by Davis, Smith and up to two other office workers. *Id.* at 17, Davis Aff. ¶ 10. It was one of several Palmer Dodge automobile dealerships at which motor vehicles were sold, leased and serviced. Curry Aff. ¶ 4. Jeffrey L. Curry ("Curry") was the Controller of Palmer Dodge, but Smith did not report to Curry on a daily basis, was not evaluated by him, and did not receive pay raises on Curry's recommendation. Curry Aff. ¶ 1; Smith Dep. at 197–99. Instead, Don Palmer was Smith's boss. Smith Dep. at 199. In 1995, Patrick J. McCune ("McCune") was the Assistant Controller, a position he had assumed after serving as accounts receivable clerk at Palmer Dodge since November, 1991. McCune Aff. ¶¶ 1, 4. Davis was hired in May of 1993 to replace McCune when he was promoted. McCune Aff. ¶ 4; Davis Dep. at 67. Curry and McCune did not work out of the same office as Smith and Davis. *See* McCune Aff. ¶ 11; Davis Dep. at 136. It was McCune that Davis finally called to report Smith's conduct.

The office in which Davis worked was not the company's headquarters, and thus it did not contain other management personnel and corporate officers. *See* Davis Dep. at 142. However, Palmer Dodge had an employee handbook covering personnel policies and procedures, a copy of which had been left in Davis's desk by McCune, who used the desk before her. McCune Aff. ¶ 5. After Davis quit, McCune found the handbook still in the desk. *Id.* The handbook contained Palmer Dodge's non-harassment policy. *Id.* The policy states that the company does not tolerate any form of harassment based on race, color, sex, religion, national origin, age or handicap, and that such harassment will be treated as a "disciplinary matter." Def's Exh. 5, Palmer

Dodge West, Inc. Harassment Policy. Harassment is defined in a non-exclusive manner, as "slurs, jokes, other verbal, graphic, or physical conduct" relating to the immutable characteristics listed therein. *Id.*

Employees are also instructed that a violation of the policy will subject the violator to "disciplinary action up to and including discharge. A second proven violation ... will result in immediate discharge." *Id.* If an employee feels she is being harassed because of her sex, she is to make her feelings known to her "immediate supervisor or any other appropriate Company official." *Id.* However, if the employee cannot discuss the matter with her supervisor, she is to "arrange for a conference with an officer of the Company...." *Id.* The Handbook did not contain a listing of the appropriate officials to whom an employee could complain if the supervisor were the harasser. Davis stated that she was unsure of who an "appropriate Company official" was, and did not know who the corporate officers were. Davis Dep. at 181–82, 199–200, 204–05. Her discussions with a coworker, Diane Nance, did not enlighten her as to the correct person to whom she should report. *Id.* at 200. At the time of the events in question, the officers and directors of Palmer Dodge were Eldon Palmer, Director, Donald L. Palmer, President, Elaine M. Palmer, Secretary. Plf's Exh. K, Interrogatory No. 22. After Davis complained to McCune, who was the person she had replaced and had trained her, she was told that the matter was not to be discussed with Don or Eldon Palmer. Davis Dep. at 353–54.

Although Palmer Dodge had this nonharassment policy, the company did not provide any training to Smith or any other supervisors about the policy, or regarding discrimination issues in general. Smith Dep. at 74. After Davis reported Smith's conduct to McCune, he investigated the allegations by interviewing Davis and Nance, while Curry questioned Smith. Curry Aff. ¶¶ 9–11; McCune Aff. ¶¶ 6–9. Curry, whose position was considered lateral to Smith's, reviewed the company's harassment policy with Smith,

then told him that any further "allegations of harassment could result in his termination." Curry Aff. ¶ 11; Smith Dep. at 92–93. He also warned Smith not to retaliate against Davis, and he removed Smith's "disciplinary authority over Davis." Curry Aff. ¶ 11. Smith abided by Curry's instructions about taking any subsequent problems he had with Davis to McCune. Smith Dep. at 196–97, 199. Even though Don Palmer was Smith's boss, Smith did not know whether Don Palmer was ever told about the complaint made by Davis. Smith Dep. at 199. Neither Curry or McCune reported the complaint to Don Palmer.[1]

## II. STANDARDS

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the opposing party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A disputed fact is material only if it might affect the outcome of the suit in light of the substantive law. *Id.*

The moving party has the initial burden to show the absence of genuine issues of material fact. *See Schroeder v. Barth,* 969 F.2d 421, 423 (7th Cir.1992). The party opposing a summary judgment motion bears an affirmative burden of presenting evidence that a disputed issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Scherer v. Rockwell Int'l Corp.,* 975 F.2d 356, 360 (7th Cir.1992). The opposing party must "go beyond the pleadings" and set forth specific facts to show that a genuine issue exists. *See Hong v. Children's Mem. Hosp.,* 993 F.2d 1257, 1261 (7th Cir.1993), *cert. denied,*

---

1. The Court has drawn this inference from the absence of any testimony from either man about reporting it to Don Palmer, from Davis's testimony that McCune told her it would just be between them, and from Smith's testimony that he did not know if Don Palmer had been told.

511 U.S. 1005, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994). This burden cannot be met with conclusory statements or speculation, *see Weihaupt v. American Med. Ass'n,* 874 F.2d 419, 428 (7th Cir.1989), but only with appropriate citations to relevant admissible evidence. *See* Local Rule 56.1; *Brasic v. Heinemann's Inc., Bakeries,* 121 F.3d 281 (7th Cir. 1997); *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 923–24 (7th Cir.1994). Evidence sufficient to support every essential element of the claims on which the opposing party bears the burden of proof must be cited. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

In considering a summary judgment motion, a court must draw all reasonable inferences "in the light most favorable" to the opposing party. *Spraying Sys. Co. v. Delavan, Inc.,* 975 F.2d 387, 392 (7th Cir.1992). If a reasonable fact finder could find for the opposing party, then summary judgment is inappropriate. *Shields Enters., Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir. 1992). When the standard embraced in Rule 56(c) is met, summary judgment is mandatory. *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Shields Enters,* 975 F.2d at 1294.

### B. TITLE VII CLAIMS

By enacting Title VII, Congress attempted to pass a law that would prevent the perpetuation of stereotypes and the corresponding degrading of persons who share certain protected characteristics, both of which close off employment opportunities to those persons. *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1483 (3d Cir.1990). The underlying purpose of Title VII was to remove artificial, arbitrary and unnecessary barriers to employment when those barriers operate to discriminate on the basis of race, sex or other protected characteristics. *Id.* The Supreme Court has held that Title VII is violated when a woman is subjected to a hostile environment created by severe and pervasive harassment because of her gender. *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 64–65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986). A plaintiff may successfully bring a sexual harassment claim under Title VII based on an alleged hostile environment by showing that the defendant's or its agent's conduct was "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405; *Hutchison v. Amateur Elec. Supply, Inc.,* 42 F.3d 1037, 1043 (7th Cir. 1994). Such a determination cannot be made by a "mathematically precise test," but instead is determined by looking at the totality of all the circumstances. *Hutchison,* 42 F.3d at 1043 (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 22–24, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993)).

In *Harris,* the Supreme Court developed a non-exhaustive list of factors to be considered when determining whether a workplace has been rendered hostile or abusive. *Dey v. Colt Const. Co.,* 28 F.3d 1446, 1453 (7th Cir.1994). Although all of the circumstances must be considered, courts are to pay particular attention to the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23–24, 114 S.Ct. at 371; *Dey,* 28 F.3d at 1453. These factors must be evaluated from both a subjective and an objective perspective. *Dey,* 28 F.3d at 1454. Therefore, courts consider not only the actual effect of the conduct, but also the effect such conduct would have on a reasonable person in the plaintiff's position. *Id.* Relatively isolated incidents of non-severe misconduct will not suffice to support a claim of sexual harassment. *Saxton,* 10 F.3d at 533. But a series of offensive statements or misconduct, if sufficiently severe and pervasive, could constitute an objectively hostile environment. *Dey,* 28 F.3d at 1456.

Employers are also prohibited from discriminating against employees because they have opposed any practice made an unlawful employment practice by Title VII. 42 U.S.C. § 2000e–3(a); *Dey,* 28 F.3d at 1457. The elements of a prima facie case establishing retaliation require a showing that:

1. plaintiff engaged in a legally protected activity;

2. employer subsequently took adverse employment action against plaintiff; and

3. employment action was *caused* by plaintiff's participation in protected activity (called by courts the "causal link").

*Rennie v. Dalton*, 3 F.3d 1100, 1109 (7th Cir.1993), *cert. denied*, 510 U.S. 1111, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir.1991); *Lloyd v. Bridgeport Brass Corp.*, 811 F.Supp. 401, 407 (S.D.Ind.1993).

Recently, the Seventh Circuit has noted that nothing in the "law of retaliation restricts the type of retaliatory act" that could satisfy the second element of the prima facie case. *Knox v. State of Indiana*, 93 F.3d 1327, 1334 (7th Cir.1996) (citing *McKenzie v. Illinois Dept. Of Transp.*, 92 F.3d 473, 485 (7th Cir.1996) (questioning whether retaliatory act must be job-related); *Smart v. Ball State University*, 89 F.3d 437, 440–41 (7th Cir.1996)). In *Knox*, the court approved the district court's instruction that employers could be liable for retaliating against a complainant by letting her co-workers "punish" her for invoking her rights under Title VII. *Knox*, 93 F.3d at 1334–35. Knox's co-workers had retaliated against her by "fellow worker harassment and vicious gossip." *Id.* at 1335.

The third element is easily satisfied by a plaintiff who can show that the protected activity and the adverse action "were not wholly unrelated." *Hunt–Golliday v. Metropolitan Water*, 104 F.3d 1004, 1014 (7th Cir. 1997). Suspicious timing provides circumstantial evidence of this causal link. *Id.* In *Hunt–Golliday*, the plaintiff showed "a pattern of criticism and animosity by her supervisors following her protected activities." *Id.* The court found that *type* of pattern sufficient to support the existence of the causal link. *Id.*

### III. DISCUSSION

The parties' arguments in favor of and opposing summary judgment reveal an interesting and significant difference in perception about the facts and the law in this case. The defendants draw sharp distinctions among Davis's claims of *quid pro quo* and hostile environment sexual harassment, and her complaint of Smith's subsequent conduct, compartmentalizing each of them separately for purposes of analysis. Davis, on the other hand, views the entire pattern of conduct by Smith as an ongoing type of harassment, first in the form of making sexual advances and comments, and then in the form of criticizing her for previously satisfactory work habits, and discriminatorily enforcing workplace rules. Framed in this light, Smith's conduct could be interpreted as having made submission to his sexual advances and comments a term and condition of her employment, and when Davis rejected him (by complaining to McCune), he set about to punish her. Whether his subsequent conduct constituted "retaliation" for her engaging in a protected activity, or merely "continued harassment" intended to coerce Davis into a sexual relationship with him, is a question a jury should answer.

Because Smith was left in a position where he could control the day-to-day working conditions for all of the employees in the office, including Davis, and because she proffered sufficient evidence from which a jury could find that he made her environment abusive and hostile, the issue of whether Palmer Dodge violated Title VII must go to the jury. The fact that Smith could no longer "discipline" Davis was of little consequence given that she had to ask him for time off; report to him on the progress of her work, accept assignments from him and work under his watchful eye in a very small office. Moreover, it is not clear that Smith's ability to discipline Davis was really removed. The evidence shows that Smith was able to complain to McCune that Davis did not clock out for lunches, and McCune, who did not work in the same office as the two and did not know whether that rule was uniformly enforced, told Davis to start clocking in and out.

Such evidence could support a finding that not only did Smith begin to complain about and criticize Davis for things

she had always done without consequence, but he also enforced workplace rules differently for her than for others. A reasonable inference that could be drawn from this is that Smith was subjecting her to unequal treatment because she had complained of his prior sexually-harassing conduct, or it could be because he thought that if he made her life miserable enough she would give in to his sexual advances. Either way, Palmer Dodge could be found liable for his actions. If his treatment of her was in fact retaliation for complaining about the harassment, Palmer Dodge would be held to a negligence standard, that is, the inquiry would be whether the employer knew, or should have known that Smith was treating her this way. If so, Palmer Dodge's acquiescence in such conduct would render them liable for a violation of Title VII. On the other hand, if Smith's treatment of her was motivated by a desire to have her "come around" and accept his sexual advances, then such conduct by a supervisor subjects Palmer Dodge to strict liability. *See Jansen v. Packaging Corp. Of America,* 123 F.3d 490 494–95 (7th Cir.1997).

■ However, if the negligence standard applies, Palmer Dodge will be subject to a heightened duty of care, because in most respects Smith remained Davis's supervisor. *See Jansen,* 123 F.3d at 502–03. In *Jansen,* a plurality of the court agreed that when the harassment comes at the hands of a supervisor, the employer is subjected to a "heightened duty of care" to make sure that "the machinery available to employees to complain of harassment" is adequate. Under this standard, the employer also has a higher duty to "investigate and respond effectively to such complaints." *Id.* When either the machinery for complaining about, or the investigation and response to, supervisor harassment, are defective, the employer will be subject to liability.

As the *Jansen* court noted, because employers "entrust supervisors with authority over other employees who may be abused, harassment by a supervisor is more likely to affect the 'terms and conditions of employment.'" *Id.* Not only that, but there is more to being a supervisor than just having the authority to discipline employees. A "super-

visor's responsibilities do not begin and end with the power to hire, fire and discipline employees, or with the power to recommend such actions. Rather, a supervisor is charged with the day-to-day supervision of the work environment and with ensuring a safe, productive workplace." *Id.* at 501 (citing *Meritor,* 477 U.S. at 76, 106 S.Ct. at 2410, (Marshall, concurring)). Sufficient evidence has been presented in this case from which a jury could find that Smith retained both the power to recommend discipline of Davis, and the ability to control her day-to-day working environment.

An example should suffice. Smith, who was perceived by Curry and McCune to have subjected Davis to enough harassment that he should be warned and stripped of his power to discipline Davis, then complained to McCune about Davis not clocking out for lunch. McCune checked Davis's time sheet and learned that she did not appear to be complying with that rule. That is all the investigating he did—he did not ask Davis about it, or talk with Nance or any other employee to see if they docked in and out. Nor does it appear that he checked other employees' time sheets. Instead, he instructed Davis to comply with the rule, regardless of whether anyone else was doing so. This could be viewed, in the light most favorable to Davis, as an example of an employer not meeting the heightened duty of care to ensure that a disciplined supervisor is not retaliating against the employee who complained about him in the first place. Any complaint about Davis from Smith should have signaled a potential problem, leading McCune to do more than just accept his complaint at face value. The fact that he did not see it as a problem allows the inference that he was not adequately trained to handle the situation. · That inference is reinforced by Smith's testimony that none of the supervisors had been trained about how to comply with the non-harassment policy.

Rather than see Smith's action as continuing harassment, the defendants focus instead on how each specific act does not meet the standard for retaliation. They argue that criticism by a supervisor of an employee's job performance does not constitute adverse em-

ployment action. *Smart,* 89 F.3d at 441–42. Maybe so, but in *Smart,* the employee's initial complaint was that a committee had not ranked her as high as another (male) candidate for a position they both wanted, and she claimed sex discrimination. The retaliation she cited was from a variety of sources, and related to inadequate training, increased job demands, and negative performance evaluations. The court was only asked to review the latter complaint, and held that a negative performance evaluation alone is insufficient to create a genuine issue of material fact regarding whether she suffered an adverse job action. *Id.* at 442. Here, the evidence is not just that Smith subjected Davis to criticism of her work performance, but he also complained about things he had not complained of before, and he did not complain when other employees did the same things. Nance Aff. ¶¶ 20–24.

█ Assuming, without admitting, that Smith's action could be seen as adverse employment action, the defendants then argue that Palmer Dodge cannot be held liable for his conduct because they did not know or could not have known. Davis never complained that Smith was retaliating against her, defendants say, so how could Palmer Dodge know? First of all, Davis does not need to specifically complain to her employer that she is the victim of retaliation. "Retaliation" is a term of art in Title VII litigation, and an employee could not be expected to know what is or is not retaliation. It is enough that she complained of conduct by her supervisor that was different from his prior conduct, and that occurred after she had complained of his alleged sexual harassment of her.

█ The employer's duty when a supervisor has sexually harassed a supervisee, and the employer leaves the supervisor in place, is to keep a watchfull eye on how that supervisor handles the employment relationship. This is because "liability for sexual harassment should stem from the delegation of authority which can be used to harass." *Jansen,* 123 F.3d at 497–98. Once Smith behaved in a way that his employer, acting through Curry and McCune, thought required disciplinary action, the fact that he

was left in a position of authority over his former victim places the company in a precarious position. The duty to monitor the situation is much higher than if the harassment had come at the hands of a co-worker. "Companies' efforts to deal with sexual harassment should be systemic and proactive, rather than discrete and reactive. . . . [C]ompanies can hire, train, and promote employees with an eye toward preventing undesirable behavior. . . . Employers who [have] not done enough to reduce the likelihood of harassment throughout the workplace [should] be found negligent, even if they had no notice that a specific employee was a harasser." Here, they had notice.

█ If a jury were to find that Smith's conduct amounted to *quid pro quo* harassment, with the *quid* being a sexual relationship, and *quo* being a pleasant working environment, then Palmer Dodge's liability will be based on *respondeat superior. Jansen,* 123 F.3d at 500. The Seventh Circuit has made it clear that the goal of Title VII is deterrence, and to achieve that goal courts must hold an employer to a strict liability standard for *quid pro quo* harassment, and a heightened negligence standard for hostile environment and retaliatory harassment by a supervisor. *Id.* at 501. Even a clear and serious threat of *quid pro quo,* without the threat being fulfilled, may subject an employer to strict liability under certain circumstances. *Id.* at 499. In addition, the threat may be communicated to the employee directly, as in the classic case, or indirectly, as in the *Jansen* case, where the supervisor told Jansen he had not forgotten her review, while patting his crotch. *Id.* at 503. The court said that because this alleged exchange "could constitute a meaningful threat, and there is no evidence as yet that Jansen did not view the threat as real, a reasonable jury could conclude that Jansen was subjected to compensable *quid pro quo* harassment." *Id.* at 503.

█ The exception to the strict liability rule is when the victim could not have reasonably believed that it was within the supervisor's power to affect the conditions of her job. *Id.* at 499–500. However, included in

the "supervisor's delegated power to hire, fire, promote, evaluate is the authority to threaten to use the power if certain conditions or requirements are not satisfied." Even though the defendants provided evidence that Smith was told that he would no longer have disciplinary authority over Davis, no evidence was presented that she was told that. The analysis proceeds from her perspective, or the perspective of a reasonable woman in Davis's place. Consequently, Davis's contention that she still believed Smith could affect the conditions of her work, coupled with his remaining in the Office Manager position after the complaint, could provide a reasonable jury with the basis for finding that Smith continued to be her supervisor.

Pointing to the 1991 Amendments of the Civil Rights Act, in which employees were given the opportunity to obtain compensation for emotional harm, the Seventh Circuit discounted the cases that have emphasized the need for a tangible adverse job consequence as an element of *quid pro quo* sexual harassment claims. *Id.* at 499–500. This same rational applies to the adverse employment action component of a retaliation claim, such that defendants' overly restrictive interpretation of how a viable claim may be presented is without merit. In light of the impact of *Jansen* on the facts of this case, the Court is unable to grant summary judgment for either the defendants or the plaintiffs on the Title VII claims. Davis has already conceded that her Title VII claim is against Palmer Dodge alone, and not against Smith. The claims against Smith are for battery, intentional infliction of emotional distress and loss of consortium by Davis's husband. None of the evidence presented suffices to create a triable issue on any of the state law claims. Consequently, summary judgment should be, and hereby is, **GRANTED** on those claims. For all the reason stated above, the motion for summary judgment on the Title VII claims is **DENIED.**

### IV. CONCLUSION

Although Davis was not actually discharged by Palmer Dodge, having instead quit, the Court finds sufficient factual issues to prevent the entry of summary judgment on the Title VII claims. Constructive discharge based on a hostile environment is actionable regardless of what has caused the hostile environment, as long as the cause is one that Title VII prohibits. If the plaintiff proves conduct that can be imputed to the employer was so severe or pervasive as to alter the conditions of employment and create an abusive working environment, she can succeed. In this action, it is not clear whether the allegedly abusive conduct was retaliation for a protected activity, or was fulfillment of a *quid pro quo* threat, or continued sexual harassment. Sufficient evidence has been presented to require the assistance of a factfinder to sort out which type of conduct occurred. Once that has been done, the standard for imposing liability on the employer will be evident.

Thus, the motion for summary judgment on all Title VII issues is **DENIED.** The Court has found insufficient evidence to present a triable issue on the state law claims, and consequently, summary judgment has been **GRANTED** in favor of the defendants on those claims.