GREGORY, Circuit Judge,
concurring in part and dissenting in part.
The district court dismissed the Plaintiffs’ claim that the City’s mishandling of their complaints was an act of retaliation, concluding that “the failure to ‘update’ [the Plaintiffs of the progress of the City’s investigation] [did] not constitute an adverse employment action.” Id. at 1354. In so holding, the district court construed the Plaintiffs’ contentions too narrowly. The Title VII violation alleged before the district court, and preserved on appeal, is not a simple failure to inform, but rather a more pernicious failure to investigate. See B.J.A. 802; Br. of Appellant [Belton] at 29; Br. of Appellant [Frederick] at 30-31; Br. of Appellant [Mackey] at 23. Because an employer’s disregard of reports of race discrimination can be an adverse employment action under Title VII, I would vacate the district court’s grant of summary judgment on the Plaintiffs’ failure to investigate claim. Therefore, on that basis alone, I respectfully dissent.
Title VII prohibits an employer from retaliating against an employee because he has complained of race discrimination in the workplace. 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, an employee must show that: (1) he engaged in protected activity, (2) his employer took adverse action against him, and (3) there is a causal connection between the protected activity and adverse action. Munday v. Waste Mgmt. of N. Am., 126 F.3d 239, 242 (4th Cir.1997).
Title VII does not confine adverse employment actions to a particular set of acts. Indeed, “[t]he law deliberately does not take a ‘laundry list’ approach to retaliation, because unfortunately its forms are as varied as the human imagination will permit.” Knox v. Indiana, 93 F.3d 1327, 1334-35 (7th Cir.1996). Further, an adverse employment action need not be an ultimate employment action, but merely one that affects the terms, conditions, or privileges of employment. Gunten v. Maryland, 243 F.3d 858, 865-66 (4th Cir.2001). “‘The phrase terms, conditions, or privileges of employment evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women [and racial groups] in employment,’ which includes requiring people to work in a discriminatorily hostile or abusive environment.” Harris v. Forklift Sys., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).
An employer’s failure to investigate a charge of discrimination affects the condi *660 tions of employment by communicating one message to the victim and yet another to the perpetrator of discrimination. Through his employer’s inaction, a victim learns that complaining is futile, that he must endure the status quo, and that his employer will stand idly by as conditions worsen. See Bernstein v. Bd. of Educ., No. 98-3910, 1999 WL 594920, at *4, 1999 U.S.App. LEXIS 18702, at *12-13 (7th Cir. Aug. 6, 1999) (“Ms. Bernstein’s employment conditions were adversely affected [by her employer’s failure to investigate] as she was forced to work in an environment where an unknown coworker or coworkers so intensely hated her that the perpetrator(s) prepared a vicious letter, complete with threats and swastikas, and mailed it to her home.”). On the other hand, a perpetrator understands that he may act with impunity. In this way, his earlier acts of discrimination are ratified, and he is emboldened to engage in more abusive conduct.
Accordingly, Title VII protects employees not only from low-level supervisors who discriminate impermissibly, but also from high-level managers who condone and encourage such conduct by failing to investigate or remedy it. See, e.g., Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C.Cir. 2006) (holding that the FBI’s refusal to investigate a death threat constitutes an adverse retaliatory action, because “a reasonable FBI agent well might be dissuaded from engaging in activity protected by Title VII if he knew that doing so would leave him unprotected by the FBI”); Galdamez v. Potter, 415 F.3d 1015, 1022 (9th Cir.2005) (“An employer may be held liable for the actionable third-party harassment of its employees where it ratifies or condones the conduct by failing to investigate and remedy it after learning of it.”); Knox, 93 F.3d at 1334-35 (recognizing that a jury must be allowed to “evaluate the record as a whole and to decide whether the State ... retaliated against Knox ... by sitting on its hands in the face of the campaign of co-worker harassment about which it knew”); Patton v. Sears, Nos. 97-2310, 98-1621, 98-1004, 2000 WL 1681017, at *2, 2000 U.S.App. LEXIS 27997, at *14 (6th Cir. Nov.1, 2000) (“[T]he jury in this case could have reasonably held Sears liable for failing to follow up on Patton’s complaints and condoning his co-workers’ harassment.”); Bernstein, 1999 WL 594920, at *4, 1999 U.S.App. LEXIS 18702, at *10-13 (holding that an employer’s allegedly “intentionally ineffective and/or negligently indifferent” attempt to discover which employee sent the plaintiff a hate letter could constitute an adverse employment action); Andrews v. Philadelphia, 895 F.2d 1469, 1479 (3d Cir.1990) (“[T]he jury reasonably could have determined that Doyle’s failure to investigate the source of the problem implicitly encouraged squad members to continue in their abuse of Andrews.”). Cf. Munday, 126 F.3d at 243 (finding no adverse employment action where “Miss Munday’s employment-related complaints were addressed, investigated and, where appropriate, corrected”).
In view of these precedents, I am persuaded that the district court cut its inquiry short. The record provides evidence from which a jury could conclude that the City took adverse action against the Plaintiffs after they complained of discrimination in September 2002. According to the Plaintiffs, during the two months following their complaints, the City failed to respond to their allegations. Although the African-American Battalion Chiefs told the City that Chief Fincher had withheld opportunities from them because of their race, see, e.g., B.J.A. 165, the City disregarded the Plaintiffs’ phone calls, see id. at 828-29, and failed to initiate an investigation, see id. at 171. Given the City’s decade-long practice of ignoring accusations of race discrimination in the Fire Department, see id. at 974, 999, the Plaintiffs *661 reasonably believed that their complaints had once again fallen on deaf ears. This belief prompted them to file charges with the EEOC. Only then, did they hear from the City. See B.J.A. 1028. Accordingly, on this record, a jury could reasonably find the City’s inaction in the face of multiple race discrimination complaints sufficient to support a claim of retaliation.
Moreover, a jury could find that the City’s subsequent actions undercut any suggestion that its prior inaction was in good faith. Indeed, a jury could conclude that the City’s purported investigation was a sham, with a predetermined outcome. The record provides little evidence of the authenticity of the investigation. For instance, no witness records, lists of questions, or interview notes were provided. Additionally, the available evidence demonstrates that in conducting the investigation, Sanders did not delve into certain matters going to the heart of the complaints. Sanders could not recall asking Chief Fincher why he continually changed the selection criteria. See B.J.A. 190. Further, he did not ask Chief Fincher why some individuals received more notice than others of the final competition, see id. at 199, or why Chief Fincher told Chief Belton that there was nothing he could have written on the exam to gain promotion during the final selection process, see id. at 215. These deficiencies perhaps explain why Chief Fincher did not recall being interviewed about the allegations. See id. at 276.
These facts, coupled with the City’s indifferent response to admitted defects in the promotion process, could lead a jury to conclude that the City did not have a sincere desire to investigate and remedy alleged Title VII violations. At the close of the purported investigation, the City had reason to believe that corrective action was warranted. The City’s own investigator acknowledged that Chief Fincher’s periodic alteration of the selection criteria and promotion process appeared “suspicious.” B.J.A. 227. In fact, when asked whether he thought race had played a role in Chief Fincher’s promotion of deputy chiefs, Sanders responded, “I think it certainly looks like it.” Id. at 242. Nonetheless, when Sanders was deposed several months after the investigation, his testimony revealed that the City had not taken steps to change the process for promotion. Sanders had yet to speak with Chief Fincher about how promotions to deputy chief could be “handled better,” see B.J.A. 1022; he did not know whether the promotion process was going to change, id.; he did not know whether Chief Fincher had instituted a nonarbitrary system for selecting people to perform special projects, id. at 212; and could not say whether Chief Fincher had been counseled about his conduct, as recommended, id. at 1034. Thus, a jury could find the investigation a mere formality, which failed to effect any changes in the Fire Department and permitted the alleged discriminatory practices to continue.
For the reasons set forth above, I would vacate the district court’s grant of summary judgment on the Plaintiffs’ failure to investigate claim and remand for further proceedings. I otherwise concur in the majority’s opinion.