Marie E. CASEY and Rita D. Denson, Plaintiffs,

v.

WAL–MART STORES, INC., Karl Katzenberger, and Jerry Brooks, Defendants.

No. 3:96–CV–274/LAC.

United States District Court, N.D. Florida, Pensacola Division.

March 14, 1998.

Warren Todd, Emmanuel, Sheppard & Condon, Pensacola, FL, for Plaintiff.

Peter Corbin, Jacksonville, FL, Dennis Larry, Pensacola, FL, for Defendants.

Jerry Brooks, pro se.

### PARTIAL SUMMARY JUDGMENT

COLLIER, District Judge.

Pending before the Court is Defendant WAL–MART's motion for summary judgment and documents in support thereof (docs.103–106, 120, 125). Plaintiffs timely filed a memorandum and evidentiary materials in opposition (docs.113–115, 126, 131). The Court has taken summary judgment under advisement (doc. 112) and is now prepared to rule on Defendant's motion. For the reasons stated below, Defendant Wal–Mart's motion for summary judgment is GRANTED in part and DENIED in part.

### I. Statement Of The Case

#### A. Background

On March 15, 1990 Plaintiff Marie Casey ("Casey") began working at Defendant Wal–Mart Stores, Inc. ("Wal–Mart") (doc. 106, exh. A:6). At the Crestview Wal–Mart store ("Crestview") Casey was employed as a cashier and trained for positions at the service desk, cash office, and layaway (*id.* at 8). Then in the summer of 1993, the Crestview store re-opened as a Wal–Mart Supercenter (*id.* at 9). At that time, Casey became the "Demo Coordinator" responsible for demonstration displays throughout the store (*id.* at 9–11). Her immediate supervisor was Jim Goodlett, the co-manager of the store (*id.* at 10; doc. 120, exh. B:11).

Shortly before the re-opening of the Crestview supercenter, Defendant Jerry Brooks ("Brooks") transferred from another Wal–Mart store to work as the market manager of the meat department (doc. 106, exh. G:16–17). While Brooks was employed at Crestview, Casey alleges that he made inappropriate sexual comments towards her and touched her on several occasions, including grabbing her thighs and hips as well as bumping her knees (*id.* at exh. A:11, 24). Despite several allegedly harassing incidents occurring between the summer of 1993 and February 1994 (*id.* atexh. F:24), Casey refrained from reporting Brooks' actions until January or February of 1994 after another employee had also reported Brooks for harassment (*id.* at exh. A:20–21, 34–36). At that time, she reported the incidents to Glenn Hosburgh, who was the store director (*id.* at 35).

In response to the complaints against Brooks, Tony Duell (the district manager) and Jody Cullifer (the district loss prevention supervisor) investigated and questioned individuals associated with the events (*id.* at exh. F:14–16). During the course of their investigation, Brooks admitted in an interview on February 17, 1994 that he had referred to Casey's breasts as "headlights" (*id.* at exh. F:attachment 1; exh. G:41). He was then immediately terminated; the decision to fire being based primarily on the "headlight" comment (*id.* at exh. F:21 & attachments 1, 2).

After Brooks' termination, Casey had no further contact with him at the Crestview store and continued on at the position of demo coordinator. (*id.* at exh. A:38). In October 1995, over eighteen months after his termination at Crestview, Brooks applied for a job at the Destin Wal–Mart superstore (*id.* at exh. G:17–18; doc. 120, exh. B:36). Jim Goodlett, who had himself transferred from

Crestview, recommended Brooks for a meat cutter's position at the Destin store (doc. 120, exh. B:37–38). Brooks was hired for the job, which was an hourly, non-managerial position (*id.* at 36). While at the Destin store ("Destin"), Brooks was promoted to a managerial position for about one week, but Tony Duell then demoted him back to his hourly position (*id.* at 38–39; doc. 113, Brooks Depo. at 26–27). Then in the fall of 1996, Duell terminated Brooks for falsifying his Destin job application, which stated that he had left Wal–Mart in 1994 for "personal" reasons (docs. 106, exh. G:18; 113, Brooks Depo. at 26–27; 120, exh. B:40). He has not been employed by Wal–Mart since his termination at Destin (doc. 106, exh. G:28–29).

Defendant Karl Katzenberger ("Katzenberger") was also employed at the Crestview store when it re-opened as a supercenter in 1993 (*id.* at exh. E:18). He was an area manager, in charge of the bakery and supervisory duties associated with the daily operations of the bakery area (*id.* at 18–19). Katzenberger held that position for approximately a year until he was switched over to the separate "hard lines" area where he also served as an area manager (*id.* at 21).[1] The switch to hard lines was considered a lateral move with no change in pay or promotional character (*id.*).

While Katzenberger was the bakery area manager, Casey alleges that he would frequently give her back rubs as well as grab her neck and touch her thighs and waist (*id.* at exh. A:38–40). She also stated that he had once rubbed up against her buttocks and made a sex-based comment to her on one other occasion (*id.* at 39–40, 60–61). Although she did not report any of these incidents immediately, Casey finally spoke to her husband about them, and the two of them reported it to Tony Duell, the store manager, in July of 1994 (*id.* at exhs. A:63–69; F:45). Within a few days of that meeting Casey

---

1. The Crestview supercenter was divided into six separate "areas" (doc. 106, exh. E:20) Each area, considered its own "Store Within a Store," had an area (assistant) manager which was a salaried position, as opposed the hourly wage paid to non-managerial associates (*id.* at exhs. D:attachment at 21; E:20). At the time Katzenberger was switched from the bakery area manager position, the Wal–Mart manage-ment hierarchy was as follows (from most to least supervisory responsibility): Brian Hardin was regional personnel manager, Charles Keith was district manager, Tony Duell was store (director) manager at Crestview, Jim Goodlett and another employee were the store's co-managers, and Katzenberger was one of several area managers (*id.* at exhs. C:6; D:6; E:21–23).

again met with Duell, who offered to transfer her to a different area in the store, but she refused (*id.* at exh. A:86–87). In the course of investigating Casey's complaint, Duell, along with Charles Keith, the district manager, spoke to various employees and concluded that Katzenberger had not made inappropriate sexual comments but did give back and shoulder rubs which were unwelcome by the female associates who received them (*id.* at exh. F:49, 53–54, 58). In late July Duell contacted Brian Hardin, the regional personnel manager, to inform him of the investigation and sought a recommended course of action to take with Katzenberger (*id.* at exh. D:28–29, 42). As a result of that conversation, Duell verbally "coached" Katzenberger and warned him that his actions were not welcome and should stop immediately (*id.* at exhs. D:29–30; F:65–66). Effective August 6, 1994, Katzenberger was then transferred to the hard lines area, which was completely separate from the bakery area where Casey still worked (*id.* at exhs. E:75–76, 81–82; F:attachment 4).

In July and September of 1994, the Wal–Mart general office issued two memoranda regarding the demo coordinator position at Wal–Mart stores (*id.* at exh. F:87–91). The memos basically directed that the demo coordinator position be eliminated and the responsibilities associated with that job be delegated to two existing area managers at each store (*id.*). When Casey's demo coordinator position was eliminated at the Crestview store, she transferred to a new position as price verifier without any change in pay (*id.* at exhs. A:108; F:90). Casey still works at the Crestview store today (*id.* at exh. A:6). Katzenberger is also currently employed by Wal–Mart, but as an area manager at a different store (*id.* at 17–18).

Casey's sister, Plaintiff Rita Denson ("Denson"), began working at the Crestview Wal–Mart when it re-opened in 1993 (*id.* at exh. B:13). She was hired by Katzenberger and worked as a bakery clerk under his direct supervision (*id.* at 15–17). While employed in the bakery area, Denson also alleges that Katzenberger gave her unwelcome

back and shoulder massages on multiple occasions (*id.* at 18–23). On two other occasions, Denson states that Katzenberger touched her legs and sides (*id.* at 25). However, despite being subjected to repeated offensive behavior, Denson did not report these instances until after Duell and Keith had already begun their investigation into Casey's complaints (*id.* at 27–28). As a result of the investigation, Denson met with them and reported the repeated back massages but did not mention any of the other unwelcome touching (*id.* at 28–29).

As a result of Katzenberger's transfer to hard lines after the investigation, Belinda Gibbons became the bakery area manager in direct supervision over Denson (*id.* at exh. H:9). Although Gibbons gave Denson good performance evaluations, Denson's employment at Crestview was ultimately terminated on May 30, 1996, almost two years after the Katzenberger investigation (*id.* at exhs. B:46; H:24). Because Denson had been repeatedly absent and late to work, Gibbons prepared a performance coaching form which required Denson's signature of acknowledgment (*id.* at exhs. B:51–53; H:25–27). The form served only as a second written coaching that would not have resulted in termination; however, because Denson refused to sign the form she was fired (*id.* at exhs. B:53 & attachment 1; H:26–27). She has not worked for Wal–Mart since her termination (*id.* at exh. B:6–8).

### B. Procedural History

Plaintiffs Casey and Denson filed charges with both the Florida Commission on Human Relations and the Equal Employment Opportunity Commission ("EEOC") in November of 1994 (doc. 11, exh. A). In their EEOC complaints, both women allege sexual harassment, sex discrimination, and retaliation by Defendants (*id.*).[2] Receiving their Right to Sue letters, (doc 1:¶ 7), Plaintiffs then filed a five count complaint in this Court and allege the same violations pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981(a)[3] (Count I), and the Florida Civil

---

**2.** Only Plaintiff Casey maintains a claim against Defendant Brooks however.

**3.** Title VII's prohibition against retaliation for opposition to conduct reasonably believed to be violative of Title VII is not identical to the kind of

Rights Act of 1992, Fla. Stat. ch. 760.10 (Count II) (doc. 1).[4] Of the remaining charges, Count III alleges negligent supervision and retention against Wal–Mart, while Counts IV and V allege battery against Defendants Katzenberger and Brooks, respectively (id.).

Defendant Wal–Mart now moves for summary judgment on the three claims pending against it (Counts I–III) (doc. 103).[5] In support of its motion, Defendant Wal–Mart has filed a memorandum of law as well as a statement of undisputed facts and evidentiary materials pursuant to both federal and local rules (docs.104–106, 120, 125). See Fed. R. Civ. P. 56; N.D. Fla. Loc. R. 56.1. In response, Plaintiffs have submitted a memorandum in opposition and their own documentary evidence in support thereof (docs.113–115, 126, 131). The Court has taken Defendant Wal–Mart's motion for summary judgment under advisement (doc. 112) and is now prepared to rule on that motion. For the following reasons, Defendant's motion is GRANTED in part and DENIED in part.

## II. Motion For Summary Judgment

### A. *Standard*

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, show that no genuine issue of material fact exists and that the party moving is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue of fact is material if it is a legal element of the claim under the applica-

ble substantive law which might affect the outcome of the case. *Id.*

At the summary judgment stage, a court's function is not to weigh the evidence to determine the truth of the matter, but to determine whether a genuine issue of fact exists for trial. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510. A genuine issue exists only if sufficient evidence is presented favoring the nonmoving party for a jury to return a verdict for that party. *Id.* "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir.1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.,* 750 F.2d 838, 841 (11th Cir.1985)).

When assessing the sufficiency of the evidence in favor of the nonmoving party, the court must view all the evidence, and all factual inferences reasonably drawn from the evidence, in the light most favorable to the nonmoving party. *Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 918 (11th Cir. 1993). The court is not obliged, however, to deny summary judgment for the moving party when the evidence favoring the nonmoving party is merely colorable or is not significantly probative. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510. A mere scintilla of evidence in support of the nonmoving party's position will not suffice to demonstrate a material issue of genuine fact that precludes summary judgment. *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990).

### B. *Discussion*

#### (i) Sexual Harassment

 In order to establish a *prima facie* case of hostile environment sexual harassment, a plaintiff must show that (1) she

---

4. Because the Florida Civil Rights Act is patterned after Title VII, federal caselaw dealing with Title VII claims also applies to its Florida counterpart. *Kelly v. K.D. Const. of Florida, Inc.,* 866 F.Supp. 1406, 1411 (S.D.Fla.1994). *See also Brand v. Florida Power Corp.,* 633 So.2d 504, 507 (Fla. 1st DCA 1994).

5. Defendant Wal–Mart is the only party moving for summary judgment, and as such only those claims against it will be considered by the Court today.

discrimination proscribed by § 1981. *Little v. United Techs.,* 103 F.3d 956, 960–61 (11th Cir. 1997) ("It is well-established that § 1981 is concerned with *racial* discrimination in the making and enforcement of contracts.") (emphasis added). The facts in the case *sub judice* do not suggest that the discrimination or retaliation allegedly leveled against Plaintiffs was due to their race, and this Court finds it unnecessary to address any claims pursuant to a § 1981 analysis. *See Little,* 103 F.3d at 961.

belongs to a protected class, (2) she was subjected to unwelcome sexual harassment, (3) the harassment was based upon her sex, (4) the harassment affected a "term, condition, or privilege" of employment, and (5) the employer is liable. *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1557 (11th Cir.1987); *Henson v. City of Dundee*, 682 F.2d 897, 903–05 (11th Cir.1982).[6]

■■■ In its analyses of employer liability in a hostile environment sexual harassment context, the Eleventh Circuit has employed traditional. agency principles and related caselaw. *Faragher v. City of Boca Raton*, 111 F.3d 1530, 1535 (11th Cir.) (en banc), *cert. granted*, —— U.S. ——, 118 S.Ct. 438, 139 L.Ed.2d 337 (1997). Under this agency approach, there are two distinct concepts which may give rise to employer liability— direct and indirect liability. *Id.* Under a theory of direct liability, an employer is directly liable if it knew or, upon reasonably diligent inquiry, should have known of the harassment and then failed to take immediate and appropriate corrective action. *Id.* (citing *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1316 (11th Cir.1989); *Henson*, 682 F.2d at 905). In establishing her *prima facie* case, the employee can show that the employer knew or should have known of the harassment by proving either that she had complained to higher management about the problem or that the harassment was so pervasive as to infer constructive knowledge on the part of higher management. *Reynolds v. CSX Trans., Inc.*, 115 F.3d 860, 866–67 (11th Cir.1997) (citing *Faragher*, 111 F.3d at 1538), *petition for cert. filed*, —— U.S. ——, 118 S.Ct. 2364, 141 L.Ed.2d 732, 66 U.S.L.W. 3324 (1997).

■ The second possibility, indirect or vicarious liability, will give rise to an employer's liability for the wrongful conduct of its agent regardless of whether that employer knew or should have known about the agent's wrongful act. *Reynolds*, 115 F.3d at 866–67. The employer is generally indirectly liable for hostile environment sexual harassment by a superior if (1) the harassment occurs within the scope of the superior's employment; (2) the employer assigns performance of a nondelegable duty to a supervisor, and an employee is injured because of the supervisor's failure to carry out that duty; or (3) there is an agency relationship which aids the supervisor's ability or opportunity to harass his subordinate. *Id.*

In determining what is the appropriate test to apply in a pure hostile environment sexual harassment case, the Eleventh Circuit has found that a supervisor's harassing conduct is typically outside the scope of his employment. *Id.* at 1536; *Steele*, 867 F.2d at 1311, 1316 ("Strict liability is illogical in a pure hostile environment setting. In a hostile environment case, no *quid pro quo* exists. The supervisor does not act as the company; the supervisor acts outside the scope of actual or apparent authority to hire, fire, discipline, or promote."(internal quotation marks omitted)). Abandoning any concept of automatic liability on behalf of employers, the Eleventh Circuit has articulated two principles under which an employer may be found liable. *Faragher*, 111 F.3d at 1536. An employer will be liable when a harasser (1) is acting within the scope of his employment in perpetrating the harassment or (2) is acting outside the scope of his employment but is aided in accomplishing the harassment by the existence of the agency relationship. *Id.* (citing *Sparks*, 830 F.2d at 1558–60).

■ In the instant case, Plaintiffs assert only a theory of direct liability and argue that Defendant Wal–Mart should be held liable for its failure to take prompt remedial action after discovering the harassment by both Defendants Katzenberger and Brooks (doc. 114:3). In order to survive Defendant's

---

**6.** In arguing that Plaintiffs cannot establish a *prima facie* case of sexual harassment, Defendant Wal–Mart only challenges the fifth prong of the test—whether the employer was liable for the harassment (doc. 104). As such, this Court declines to address at length whether Plaintiffs are able to establish the other four elements of the *prima facie* case. Rather, viewing the facts in a light most favorable to Plaintiffs, the Court finds that Plaintiffs can satisfy those requirements for the purposes of this motion for summary judgment. As women, Plaintiffs are members of a protected class, and they have demonstrated that at least a question exists as to whether the acts were welcome, whether they were sex based, and whether the harassment affected a term or condition of their employment.

motion for summary judgment, Plaintiffs must first show that Wal–Mart had either actual or constructive knowledge of the harassment and can do so by proving that they complained to higher management or that the harassment was so pervasive as to infer knowledge on the part of higher management. *Reynolds,* 115 F.3d at 866–67.

Although it is undisputed that Defendant Wal–Mart acted promptly after they reported Brooks and Katzenberger in February and July of 1994 (doc. 106, exhs. A:20, 63, 69; F:45),[7] a genuine issue of material fact exists as to whether Defendant Wal–Mart knew of the harassment prior to it being reported in 1994. Record evidence, when viewed in a light most favorable to Plaintiffs, shows that there were higher-level supervisors and other employees who observed Defendants Brooks and Katzenberger harassing Plaintiffs on several occasions (docs. 106, exh. A:12–13; 113, Katzenberger Depo. at 48–49, 54–55). This factual contention creates a question as to whether Defendant Wal–Mart learned of the harassment when reported by Plaintiffs in 1994 or earlier when higher-level supervisors observed the harassing behavior. As such, the question of whether Defendant's remedial actions were taken in a *prompt* manner necessarily becomes a disputed issue

properly left for a jury[8] and Defendant's motion for summary judgment on the hostile environment sexual harassment must be DENIED.

▪▪▪ The Court is able to reach its conclusions today without regard to whether Defendant Wal–Mart also had constructive knowledge of the harassment. However, even if a genuine issue of fact does exist as to this narrow issue, "an employer is insulated from liability under Title VII for a hostile environment claim premised on constructive knowledge of the harassment when the employer has adopted an anti-discrimination policy that is comprehensive, well-known to the employees, vigorously enforced, and provides alternate avenues of redress." *Farley v. American Cast Iron Pipe Co.,* 115 F.3d 1548, 1553–54 (11th Cir.1997). After examination of Defendant's anti-harassment policy, the Court finds that the policy satisfies the criteria delineated above and thus protects Wal–Mart from the imputation of constructive knowledge. That policy states:

> **Harassment of any type, whether sexual, ethnic, racial, etc., is not tolerated at Wal–Mart.** We want to provide a work environment where everyone is comfortable. If you, or someone you work with,

---

**7.** Soon after Defendant Brooks was reported to management, the district manager began an investigation into the allegations (doc. 106, exh. F:14–16). Brooks was immediately terminated from his position at Crestview as soon as the charges were substantiated (*id.* at exhs. F:21, attachments 1–2; G:41). Similarly, Defendant Wal–Mart promptly investigated the claims of harassment by Defendant Katzenberger soon after they were reported in July 1994 and transferred and reprimanded him within one month of the initial complaint by Plaintiffs (*id.* at exhs. D:28–29; F:attachment 4).

**8.** The Court notes, however, that it is only this issue of promptness which remains in dispute. The remedial actions taken by Defendant in response to both Brooks and Katzenberger were "reasonably likely to prevent the misconduct from recurring." *Reynolds,* 115 F.3d at 867 (quoting *Guess v. Bethlehem Steel Corp.,* 913 F.2d 463, 465 (7th Cir.1990)). Brooks was fired from the Crestview store, and although he was later briefly employed by a different Wal–Mart, Plaintiff Casey does not allege any subsequent incidents of harassment after his termination (doc. 106, exh. A:38).

Additionally, while Katzenberger was not terminated, he was reprimanded and transferred to a different area of the Crestview store (*id.* at

F:65–66 & attachment 4). After his transfer, Casey had no further contact with Katzenberger except to pass him in the store on a daily basis (*id.* at exh. A:104). Moreover, Denson had only one incident after the Katzenberger transfer where she alleges he harassed her (*id.* at exh. B:30). However, that incident, even when viewed in a light most favorable to Plaintiff, is legally insufficient to find that Wal–Mart's action was not "remedial." A reasonable juror could not find that the acts taken by Defendant Wal–Mart, including moving Katzenberger from his bakery position, instructing him to stop any touching immediately, threatening him with transfer or termination, and having him re-read Wal–Mart's harassment policy, (*id.* at exh. F:attachment 4), did not constitute action reasonably likely to prevent the misconduct from recurring. *Reynolds,* 115 F.3d at 867–68. Finally, although both Plaintiffs stated their desire to see Katzenberger fired, (doc. 106, exhs. A:165; B:85), that expectation has no legal significance, as the Eleventh Circuit has never held that a complainant in a discrimination action has a right to the remedy of her choice. *Farley v. American Cast Iron Pipe Co.,* 115 F.3d 1548, 1555 (11th Cir.1997).

has been a victim of harassment, you should immediately report the offensive conduct to your immediate supervisor or member of the Coaching team. You may also contact your Regional Personnel/Zone Personnel representative. You can be sure your report will be thoroughly investigated and appropriate action taken. Confidentiality will be maintained to the extent practical, and no retaliation will be taken against associates who report harassment.

(doc. 106, exh. F:attachment 3 at 14) (boldface type in original).

When hired, Plaintiffs received a copy of the Associate Handbook, which contained this provision, and signed acknowledgments indicating that they read and understood the contents of it (doc. 105, exh. B). Through the creation and implementation of this policy, Defendant Wal–Mart has made reasonably diligent efforts to learn and know of the conduct of its employees, placing upon them the obligation to utilize the procedural mechanisms established by the company specifically to address problems and grievances. *Farley*, 115 F.3d at 1552–53. Therefore, in light of Wal–Mart's anti-discriminatory policy, Plaintiffs are unable to establish liability via a theory of constructive knowledge regardless of any factual dispute that may exist as to that issue.[9]

### (ii) Retaliation

■ Title VII prohibits an employer from taking adverse employment action against an employee because she "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a). In order to establish a *prima facie* case of unlawful retaliation under Title VII, an employee must show that (1) she was engaged in protected activity, (2) she was subsequently subjected to an adverse employment action, and (3) a causal connection exists between the protected activity and the adverse employment action. *Meeks v. Computer Assocs. Int'l,* 15 F.3d 1013, 1021 (11th Cir.1994).

■ Once a plaintiff establishes her *prima facie* case, the defendant must proffer a legitimate, non-discriminatory reason for the adverse employment action. *Id.* Here the employer's burden is "exceedingly light." *Id.* (quoting *Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1495 (11th Cir.1989)). The plaintiff must then demonstrate that the employer's stated reasons are mere pretext designed to mask retaliation. *Meeks,* 15 F.3d at 1021. While the burden of production shifts, the burden of persuasion at all times remains with the Plaintiff. *Id.*

■ In the instant case Plaintiff Denson is not able to establish a *prima facie* case of retaliation in response to her complaints of harassment. In 1994 Denson complained to management of harassing behavior and ultimately filed a discrimination charge with the EEOC, which is a statutorily protected activity. *See Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 920 (11th Cir.1993). She claims that after reporting the harassment, the store director, Tony Duell, would stare at her and give her "dirty looks" (doc. 106, exh. B:58–59). Plaintiff Denson also asserts in her memorandum that her termination, which occurred almost two years after reporting Katzenberger, was retaliatory in nature (doc. 114:17–18). However, neither of these events,[10] even when taken in a light most favorable to Plaintiff Denson, satisfy her burden of demonstrating a *prima facie* case. *See Hill v. Mississippi State Employment Serv.,* 918 F.2d 1233 (5th Cir.1990) (holding that allegations that co-workers were staring at employee, making her wait for disbursement checks, relegating her file to less desirable classification, deleting expe-

---

9. Again, the Court emphasizes that this conclusion has no bearing on its previous finding that a genuine issue of material fact exists as to whether Wal–Mart had actual knowledge of the harassment before it was formally reported. *See Farley,* 115 F.3d at 1554 ("Where there is evidence from which a jury reasonably could infer that the employer *did* know of the harassment, of course, the existence of a policy—no matter how well-designed—will not absolve an employer of liability under Title VII.").

10. There is also some evidence in the record that Plaintiff Denson was "written up" on one occasion, which was prompted by a health department inspection of the bakery area where she worked (doc. 106, exh. B:57–58). However, all but one employee working that day were "written up," and Plaintiff admitted at deposition that the incident was not retaliatory for reporting Katzenberger, nor does she argue to the contrary in her memorandum (*id.*).

rience data from reference form, and criticizing her EEOC complaint did not amount to retaliation).

Although termination is not the only form of adverse employment action contemplated by Title VII, *see, e.g., McCabe v. Sharrett,* 12 F.3d 1558, 1563 (11th Cir.1994), Plaintiff has not cited to any authority which construes adverse employment action to include "stares and dirty looks." *But see Jordan v. Wilson,* 851 F.2d 1290, 1292–93 (11th Cir.1988) (indicating that a term or condition of employment must be affected in order for there to be an adverse employment action); *Perryman v. West,* 949 F.Supp. 815, 819–21 (M.D.Ala.1996). Plaintiff cites to only two Seventh Circuit cases which, even if they were binding, are inapplicable here (doc. 114:14). *See Collins v. Illinois,* 830 F.2d 692, 703–04 (7th Cir.1987) (finding that a lateral transfer without reduction in salary or benefits constitutes an "adverse job action"); *Knox v. Indiana,* 93 F.3d 1327, 1334–35 (7th Cir.1996) (holding that it was properly left for a jury to decide whether the state retaliated against plaintiff, a correctional guard who caused demotion of captain in the prison, by "sitting on its hands" in response to a campaign of co-worker harassment involving "insulting and demeaning" statements about plaintiff of which state was aware). *Collins,* a position transfer case, has simply no application to Plaintiff Denson. Furthermore, the actions of the store director in the instant case do not amount to the level of insulting and demeaning statements at issue in *Knox,* which were made in front of staff and inmates by several of the captain's friends who threatened that they would make plaintiff's life "hell" [11] and would "get her." *Knox,* 93 F.3d at 1331.

Additionally, even though Denson's termination in 1996 undisputedly amounts to an adverse employment action, she cannot show that her termination is causally connected to her protected activity. Indeed, in order to show this causal nexus, a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated. *Meeks,* 15 F.3d at 1021. However, Plaintiff cannot show any genuine issue of material fact which, even if taken as true, would establish the requisite link between the protected activity and the adverse action.

Plaintiff Denson reported her incidents of harassment to management in July of 1994 but was not terminated until May 30, 1996 (doc. 106, exh. B:27–28, 46). Although counsel for Plaintiff now maintains that the circumstances surrounding her termination indicate retaliatory motive, the Court is not compelled by that argument. In her deposition Plaintiff Denson readily admitted that her termination had no relation to her reporting defendant Katzenberger to the store and district manager (*id.* at 55). Rather, Denson testified that she was terminated for her failure to sign a coaching form which acknowledged problems with her tardiness and absences at work (*id.* at 51–55). It was this decision to fire her which Plaintiff now challenges as retaliatory in nature (doc.

---

11. The Court realizes that Sharon Dollar, another Wal–Mart employee who complained of harassment, stated at deposition that she and Plaintiff Casey caught "H–E double L" after reporting the harassment (doc. 113, Dollar Depo. at 10). However, as similar as the choice of word may be, Dollar's depiction of her treatment as "hell" does not, without more, make *Knox* any more applicable.

Moreover, even if the Court were to find those Seventh Circuit cases persuasive, other caselaw exists in that circuit which clearly rejects Plaintiffs' contentions. *See Moore v. Carlucci,* 1988 WL 17615, at *10 (N.D.Ill.1988) ("Personality conflicts at work are not equivalent to discrimination or retaliation, even when such conflicts generate antipathy and make an individual's position more difficult."), *aff'd,* 893 F.2d 1337 (7th Cir.1989) (table decision), *cited in,* 1 BARBARA LINDEMANN & PAUL GROSSMAN, EMPLOY-

MENT DISCRIMINATION LAW, 669 (3d ed.1996).

It is also interesting to note that a district court in the Eleventh Circuit has firmly rejected the holding in *Knox* and stated that "[t]his court is not persuaded by the *Knox* decision ... that mere harassment may be recognized as an adverse employment decision. The *Knox* court did not discuss any term or condition of employment that was affected by the harassing conduct and ... this court finds that it is not sufficient, for a finding of an adverse employment decision, merely to find that harassing remarks were made, but rather, there must also be a finding that those remarks altered a term or condition of employment by either affecting work performance or by creating a hostile environment." *Perryman v. West,* 949 F.Supp. 815, 820 (M.D.Ala.1996).

114:18). She argues that because Wal–Mart has implemented a formula for disciplining associates at the stores, its failure to follow those procedures in her case gives rise to an inference of retaliation (*id.*). However, her argument is flawed in several respects. Plaintiff maintains that immediate termination can only occur where there has been gross misconduct and that in all other cases coaching [12] should occur according to the steps outlined on the coaching form (*id.*). While this may be true, it is also important to note that coaching is exactly what management was attempting to do with Plaintiff Denson. Denson refused to sign the second written coaching form which was prepared as a result of repeated tardiness and absences from work (doc. 106, exh. B:attachment 1). If Denson *had* signed the form and acknowledged her deficiencies, she would not have been terminated.[13]

*Arguendo,* even if Wal–Mart improperly terminated Plaintiff Denson, such failure does not infer retaliation for an incident which occurred two years prior. Plaintiff does not show that the two events are not completely unrelated, but rather states that simply because procedure was not followed an inference of retaliation arises. No connection is made, or even attempted, to demonstrate that the two events are somehow factually linked. *See Figgous v. Allied/Bendix Corp.,* 906 F.2d 360, 362 (8th Cir.1990) (holding that discharge two years after charges were filed was not close enough in time to infer a retaliatory motive). Belinda Gibbons, the supervisor who replaced Kat-

zenberger, had no role in reprimanding or disciplining Katzenberger, and there is no evidence in the record which shows that Jon Kurpil, the other manager who was present when Denson was fired, (doc. 106, exh. B:52), was even employed at the Crestview store when Katzenberger was reported. Because Plaintiff Denson cannot establish a *prima facie* case of retaliation, Defendant Wal–Mart's motion for summary judgment as to that claim must be GRANTED.

 Plaintiff Casey contends that after reporting Brooks and Katzenberger to management she was also retaliated against by management and co-workers (doc. 114:15–17).[14] Much like Plaintiff Denson, she claims that she became the subject of "dirty looks" and no longer worked in the friendly atmosphere she once experienced (doc. 106, exh. A:81–82, 91). Beyond these conclusory statements about her working environment,[15] Plaintiff does not identify specific instances which would demonstrate an adverse employment action as required under the second prong of a *prima facie* case of retaliation. *See Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 707 (5th Cir.) ("Hostility from fellow employees, having tools stolen, and resulting anxiety, without more, do not constitute ultimate employment decisions, and therefore are not the required adverse employment actions.") (citing *Landgraf v. USI Film Prods.,* 968 F.2d 427, 431 (5th Cir.1992), *aff'd,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)), *cert. denied,* —— U.S. ——, 118 S.Ct. 336, 139 L.Ed.2d 260 (1997). Furthermore,

---

**12.** "Coaching" is simply a term used by Wal–Mart to describe management's counseling or reprimanding of associates for various disciplinary infractions (doc. 106, exh. D:attachment B at 13 ("[Wal–Mart's] Coaching for Improvement process is designed to inform an associate when she or he is not meeting the requirements and expectations of their position.")).

**13.** Although Plaintiff argues that before she could be fired she was entitled to a "decision day," which was the next step after the second written coaching, that contention cannot be reconciled with her refusal to acknowledge the second written coaching and is rendered immaterial. Her declination to sign the form made any further discipline essentially futile, as Denson had already shown her rejection of Wal–Mart's disciplinary process.

**14.** Plaintiff Casey relies in part on the deposition testimony of fellow employee Sharon Dollar, who also reported harassment to management (doc. 114:15–16). It is important to note, however, that much of Dollar's testimony involves personal knowledge of only retaliatory treatment suffered by her and not Casey.

**15.** The behavior Casey complains of, even if broken down into specific incidents, would not amount to an adverse employment action. Casey admits that her managers and co-workers cooperated with her in completing projects associated with work and answering her questions, but expressed displeasure that her co-workers were not more congenial in their day-to-day interaction (doc. 106, exh. A:81, 91). However, while a workplace must be a non-hostile environment, Plaintiffs point to no authority requiring it to be friendly.

although Plaintiff Casey's argument based on her transfer from demo coordinator to price verification is more meritorious, the question still remains as to whether that transfer constitutes an adverse employment action as required for a retaliation claim brought under Title VII. The Court now answers that question in the negative.

"Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions." *Mattern*, 104 F.3d at 707 (quoting *Dollis v. Rubin*, 77 F.3d 777, 781–82 (5th Cir.1995)). Ultimate employment decisions include not only termination, but also hiring, granting leave, promoting, and compensating. *Mattern*, 104 F.3d at 707. In the case *sub judice*, Plaintiff states that she suffered an adverse employment action when she was transferred; however, as a price verifier Plaintiff did not suffer any decrease in pay (doc. 106, exh. A:108). Furthermore, although her new position entailed entirely different responsibilities than those of a demo coordinator (*id.* at 109–10), Plaintiff has not demonstrated how those new job responsibilities constituted an adverse employment decision. Because the job transfer was not an adverse employment action, Plaintiff's *prima facie* case of retaliation must fail.

Moreover, even if Plaintiff could demonstrate that transfer to the price verification position was an adverse action, she still cannot establish the causal connection between that "demotion" and her protected expression which would otherwise satisfy a *prima facie* case. Plaintiff Casey admitted at deposition that she knew the demo coordinator position was eliminated by the home office

and was not in retaliation for her previous harassment complaints:

Q: At some point, did you stop being the demo coordinator?

A: When it was eliminated.

Q: The position was eliminated by the company?

A: By the company.

Q: Do you believe that the company eliminated that position in any way because you had complained about Mr. Brooks?

A: I knew better. I knew that it was not. It was eliminated because it was—home office.

Q: So it didn't have anything to do with Mr. Katzenberger or Mr. Brooks?

A: No.

(doc. 106, exh. A:107–08). There is simply no compelling evidence in the record which indicates retaliatory motive in eliminating the demo coordinator position. Furthermore, although Plaintiff's memorandum states that the demo coordinator position was not taken over by area managers until after Casey was transferred (doc. 113, Keith Depo. at 69), which of course this Court must accept as true for the purposes of summary judgment, there is other record evidence indicating that at the time management spoke with Casey about the position's elimination, they had already known about that directive from the home office (doc. 120, exh. B:56–61).[16] Because Plaintiff Casey cannot establish a *prima facie* case of retaliation, Defendant Wal-Mart's motion for summary judgment is GRANTED as to that claim.[17]

### (iii) Negligent Supervision & Retention

■ In moving for summary judgment on Plaintiffs' negligence claim, Defendant first

---

**16.** Although this would seem to raise an issue of fact as to when the position was eliminated, neither party has submitted evidence which clarifies the apparent discrepancy in dates. However, the Court finds that if an issue of fact does indeed exist, it is immaterial to the analysis. The evidence clearly shows that at a meeting attended by Plaintiff Casey, Jim Goodlett, and Tony Duell, the parties discussed Casey's transfer *which was necessitated by the home office's directive to eliminate the position*. Deposition testimony of all three of the meeting's participants shows that each was aware that the elimination of the position had already been decided by the

company regardless of whether it had been *formally* implemented by the home office (docs. 106, exhs. A:112; F:86–88; 120, exh. B:56).

**17.** The Court notes that Plaintiff Casey also claims that she only received a twenty cent raise and a standard evaluation after a new manager took over Katzenberger's area director position in the grocery (doc. 114:17). The Court also notes that Plaintiff makes this bare allegation without demonstrating how that amounts to an adverse employment action and refuses to address such a meritless contention.

makes the threshold argument that such cause of action does not exist under Florida law (doc. 104:21). Defendant then argues in the alternative that even if a negligence claim is cognizable, Plaintiffs have not produced sufficient evidence, even when viewed in a light most favorable to them, to defeat a motion for summary judgment (*id.* at 22). Because Florida recognizes a negligent supervision and retention claim and a genuine issue of material fact exists as to Defendant's liability, that issue must properly be left for a jury to resolve.

The cases relied on by Defendant do not address negligent retention based on a violation of Title VII or its Florida counterpart. Rather these cases address whether a defendant may be sued for negligence on the premise of common law sexual harassment. *Robertson v. Edison Bros. Stores, Inc.*, No. 94–1315–CIV–ORL–19, 1995 WL 356052 (M.D.Fla. Apr.11, 1995) (holding that claim based on common law sexual harassment could not withstand motion to dismiss where Florida did not recognize tort of sexual harassment); *Yeary v. Florida, Department of Corrections*, No. 95–583–CIV–J–16, 69 Fair Empl. Prac. Cas. (BNA) 382 (M.D.Fla. Oct.10, 1995), *available at* 1995 WL 788066 (holding that because Florida does not recognize common law cause of action for sexual harassment, plaintiff could not maintain claim characterized as "negligence action based on common law sexual harassment"); *but see Sparks v. Jay's A.C. & Refrigeration, Inc.*, 971 F.Supp. 1433, 1436–40 (M.D.Fla. 1997) (rejecting *Robertson* and extensively discussing an employer's respondeat superior liability for intentional torts committed within the context of sexual harassment).

In the case at bar, Plaintiffs do not ground their cause of action in negligence based on a common law sexual harassment theory. Rather, the complaint alleges that:

[T]he Defendant, Wal–Mart, breached its duty of care owed to the Plaintiff's [sic], Casey and Denson, by negligently failing to take appropriate and timely corrective action, up to and including termination, against the Defendants, Katzenberger and

Brooks, such that the Plaintiffs, Casey and Denson, were exposed to the unlawful touching, harassment, retaliation and disparate treatment which forms the basis of this lawsuit.

(doc. 1:¶ 46). Plaintiffs are not proceeding under some non-exsistent, sexual harassment tort theory. Rather, a plain reading of the complaint shows that Plaintiffs base Count III in negligent retention and supervision, which is a clearly recognized cause of action in the Florida courts.[18] *See Tallahassee Furniture Co. v. Harrison*, 583 So.2d 744, 750 (Fla. 1st DCA 1991) ("The concept of employer liability for negligent hiring or retention of an employee is not of recent vintage in the law of Florida, having found clear expression at least by 1954 . . . ."), *quoted in, Watson v. Bally Mfg. Corp.*, 844 F.Supp. 1533, 1537 (S.D.Fla.1993), *aff'd,* 84 F.3d 438 (11th Cir.1996) (table decision). *See also M.V. v. Gulf Ridge Council Boy Scouts of Am., Inc.*, 529 So.2d 1248, 1248 (Fla. 2d DCA 1988).

Like Wal–Mart here, the defendants in *Watson* maintained that a claim based on negligent retention was not a cause of action recognized by the courts. 844 F.Supp. at 1537. In rejecting this contention, the court found that in Florida, "negligent retention of an employee 'occurs when, during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicate his unfitness, but the employer fails to take further action, such as investigation, discharge, or reassignment.'" *Watson*, 844 F.Supp. at 1537 (quoting *Harrison*, 583 So.2d at 753). *See Faragher v. City of Boca Raton*, 864 F.Supp. 1552, 1567 (S.D.Fla.1994), *aff'd in relevant part on reh'g en banc*, 111 F.3d 1530 (11th Cir.), *cert. granted,* —— U.S. ——, 118 S.Ct. 438, 139 L.Ed.2d 337 (1997). The same requirement of actual or constructive knowledge is also a necessary element of a claim founded on negligent supervision. *Gulf Ridge Council Boy Scouts*, 529 So.2d at 1248, *cited in, Faragher*, 864 F.Supp. at 1567.

18. Moreover, even if Defendant is somehow attempting to argue that as a prerequisite to bringing a negligent retention claim a plaintiff must plead an underlying common law tort, Plaintiffs in the instant case have done so, alleging unlawful touching under a tort theory of common law battery (doc. 1 at ¶¶ 49, 54).

Turning to the facts of the instant case, Plaintiffs have demonstrated that a genuine issue of material fact exists as to whether Defendant was negligent. As discussed previously, there is a question of fact as to when Defendant Wal–Mart actually learned of the harassment ultimately reported by Plaintiffs Casey and Denson. Part II(B)(i), *supra* page 10–11. If Defendant knew of the harassment before it was "formally" reported by Plaintiffs, a question arises as to whether Wal–Mart's remedial actions were *promptly* taken in response to Plaintiffs' complaints. When viewing the evidence in a light most favorable to Plaintiffs, they have demonstrated that issues of fact exist as to when higher management had actual notice of the harassment (docs. 106, exh. A:12–13; 113, Katzenberger Depo. at 48–49, 54–55).

Indeed, if Defendant only learned of the harassment for the first time when it was reported by Plaintiffs, the negligent retention and supervision claim would necessarily fail. Plaintiffs cannot show that issues of fact exist as to the promptness or appropriateness of Defendant's response once it was "formally" reported, nor can they show that Defendant knew or should have known of any harassing activity by either Katzenberger or Brooks occurring *before* the incidents which allegedly began in 1993 (doc. 106, exhs. A:11, 24, 38–40; B:18–23; F:24). However, as discussed above, because there is a factual dispute as to when Defendant actually learned of the harassment, summary judgment must be DENIED.

### III. SUMMARY

The Court's ruling in this matter may be summarized as follows, and IT IS HEREBY ORDERED:

1. Defendant Wal–Mart's motion for summary judgment (doc. 103) on the issue of hostile environment sexual harassment is **DENIED** as to both Plaintiffs.

2. Defendant Wal–Mart's motion for summary judgment (doc. 103) on the issue of retaliation is **GRANTED** as to both Plaintiffs.

3. Defendant Wal–Mart's motion for summary judgment (doc. 103) on the issue of negligent supervision and retention is **DENIED** as to both Plaintiffs.